**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| Gina Zahran, individually and on behalf of all others similarly situated, | ) ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| Bank of America, N.A., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## CLASS ACTION COMPLAINT

Plaintiff Gina Zahran ("Plaintiff"), through counsel, files her complaint on behalf of herself and all others similarly situated, against Defendant Bank of America, N.A. ("BofA") and alleges:

### I. Introduction.

1. "With a value of over $10 trillion, the U.S. mortgage market is the largest consumer financial market in the world."[1] BofA holds outstanding consumer mortgage loans of $236 billion.[2] BofA is one of the country's largest banks, and one of the most profitable, with revenues of $91 billion in 2019.[3] And a home is the most expensive purchase an ordinary consumer will ever make. BofA has far more power than any individual homeowner.

2. Given those facts, it is fair to require BofA to treat consumers fairly when it comes to their mortgages, including transparency of information, and, having systems in place to avoid selling customers profitable add-on financial products unless and until the consumer has been

---

[1] Consumer Financial Protection Bureau, CFPB Monthly Snapshot Spotlights Mortgage Complaints, Feb. 8, 2017, available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-monthly-snapshot-spotlights-mortgage-complaints/ (accessed Aug. 3, 2020).
[2] BofA 2019 Annual Report and Form 10-K, Table 20, Consumer Credit Quality; Table 23, Residential Mortgage – Key Credit Statistics, http://investor.bankofamerica.com/annual-reports-proxy-statements/2019_Annual_Report (accessed Aug. 3, 2020).
[3] BofA 2019 Annual Report and Form 10-K, p. 40.

1

provided with all the information about the product and given their consent in writing. The experience of Ms. Gina Zahran with her home loan, however, reflects not only her entitlement to damages on her individual claim, but also the existence of multiple uniform bank practices that affect a larger class of other consumers. Those are:

  a. a policy against promptly playing back call recordings or providing copies of those recordings to consumers whose own voices are on those calls, even if they need to hear the playback to resolve a dispute with BofA, and even though current technology and information systems allow BofA to make call recordings available to consumers at a minimal cost to BofA; and despite the fact that in the internet age, the consumers have a property interest in the data that exists in the form of their own captured voices;

  b. a policy of enrolling customers in profitable add-on financial products and new accounts without their consent, including opening add-on escrow or impound accounts for ongoing mortgage servicing consumers, without giving them the opportunity to first agree to the purchase of this add-on financial product via informed written consent – despite basic contract-law principles and the ready availability of "e-sign" technology to solve the problem;

  c. a policy of paying property insurance premiums to third party insurers for customers under mortgage escrow accounts, without performing proper due diligence to ascertain whether the monies should be paid, in order to create a barrier to the consumer cancelling the escrow; and

  d. a policy of using a customer service call center system that walls-off different departments, limits internal information access of front-line customer service representatives, causes long hold times, and unilaterally ends calls, to create a disincentive for customers who are seeking to make choices and take actions that may benefit the individual consumer but cause detriment to BofA's profits.

  3. Each of these above-described issues affects a definable class or cohort; each can be proved by evidence in BofA's possession; each may be redressed by damages or equitable relief for ongoing mortgage borrowers. Accordingly, Ms. Zahran brings this action, both to recover on her own claim individually, and to obtain broader relief on behalf of a putative class of other similarly-situated individuals.

## II.    The parties.

4.      Plaintiff, Gina Zahran, is a natural person who is a resident and citizen of North Carolina and who has a primary residence at 10827 Maryfield Lane, Charlotte NC 28277-0129, in Mecklenburg County.

5.      Defendant, Bank of America, N.A. is a national banking association with its principal place of business in North Carolina. It is a citizen of North Carolina, and may be served with process at its Principal Office, 100 North Tryon Street, Charlotte, NC 28255, or c/o its Registered Office, CT Corporation System, 160 Mine Lake Ct Ste 200, Raleigh, NC 27615.  It is a federally chartered bank headquartered in Charlotte. Through its network of branch locations, BofA conducts substantial business in the State and the District.

## III.    Jurisdiction and venue.

6.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 class members, and the aggregate amount in controversy exceeds $5,000,000.  This Court also has jurisdiction under 28 U.S.C. § 1331, in light of the federal question alleged hereinbelow, with supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.

7.      Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in this District because BofA resides in this District and is a resident of North Carolina.

8.      This Court has personal jurisdiction over the parties.

## IV. **Factual allegations.**

### A. **General background.**

9. Upwards of 70% of all consumer home loans today include an escrow account by which the lender adds an extra charge to the monthly mortgage payment, which goes into a special account, to the benefit of the lender via interest accruals. Lenders from that account pay property insurance premiums and taxes as they come due on the property. Only a minority of states allow any of that interest to go to the consumer by statute. In both Florida, where Ms. Zahran's BofA mortgage was originated, and North Carolina, where she resided at the time BofA improperly added an escrow account, the interest from an escrow account is kept by the lender.

10. Thus, lenders have an incentive to open escrow accounts for home loan borrowers because they get paid more money from the consumer and can profit off what amounts to a non-interest-bearing account. They have more control to make sure the taxes and insurance on the property stay current. They are less likely to be threatened by a tax lien asserted by the unpaid government property tax collector, or, face a situation of no insurance coverage if the house burns down or there is some other such event wrecking property value. Further, lenders can include an extra "cushion" charge in the escrow, even above what may truly be needed to cover taxes and premiums as they come due, thereby increasing the interest accruing to the lender. For all these reasons, lenders have historically engaged in a series of systematic abuses of escrow accounts that have led to a series of lawsuits and regulatory initiatives seeking to block these abuses.[4] However, as the legal landscape has evolved, so have the abuses.

---

[4] *See* Bruce E. Foote, Mortgage Escrow Accounts: An Analysis of the Issues, Congressional Research Service, Dec. 10, 1998 ("Foote 1998"), pp. CRS-3 (noting enactment of laws after "lobbying and class action suits by consumer groups"); CRS-4 (describing provisions of Real Estate Settlement Procedures Act of 1974 (RESPA) and Regulation X meant to curb escrow abuses); CRS-5 to -8 (amendments to Regulation X in 1990s).

4

11.     For the consumer, the value of the escrow account is more disputable.  Lenders argue that it makes life more convenient for the consumer because she does not have to keep track of when her property tax and insurance premiums are due.  But on the other hand, the effect of the escrow account charge added on top of the base mortgage payment means the consumer *does* have to keep track of and stay current on a *larger* home loan payment.  In the case of Ms. Zahran, as described further below, the effect of BofA's addition of an improper and unwanted escrow account was to nearly double her mortgage payment.

12.     For many consumers, there is no option but to agree to the extra charge of an escrow account.  For example, a first-time home buyer, or a buyer with credit issues, may not be able to obtain home loan offers without an escrow.

13.     However, for consumers who have better credit or a stronger track record, in the competitive marketplace of mortgage loans and refinancing, they may have the power to obtain a loan without an escrow account.  Such was the case for Ms. Zahran in 2013 when she refinanced her mortgage on the condominium property she owns in Florida with BofA.

14.     Most generic mortgage forms contain language reciting that the consumer agrees to an escrow account unless it is waived in writing.  For those who avoid the escrow, one of the closing documents may be a written and signed escrow waiver.  It is a standalone contract. Ms. Zahran entered into such a waiver with BofA at her March 2013 mortgage closing.  Accordingly, in a "Clarity Commitment" document BofA issued in connection with the mortgage, BofA stated "Your loan does not include an escrow account for items such as property taxes and insurance. You are responsible for paying the items separately from your monthly mortgage payment."

5

15.     The written escrow waiver agreement Ms. Zahran signed was an enforceable contract.  Ms. Zahran performed her end of the contract by paying her property taxes and property insurance premiums each year after 2013.

16.     For the escrow waiver agreement to not be illusory, it must be read to mean that BofA will not thereafter (during the mortgage servicing phase) create an escrow account for Ms. Zahran unless creation of that account is based on Ms. Zahran not performing her duty of paying property taxes and insurance, or, unless she voluntarily agrees in a subsequent contract with BofA to pay for a new escrow account and allow an escrow account to be created by BofA for her.

17.     The 2013 mortgage agreement and the escrow waiver were written signed contracts between the parties that were agreed to by the consumer before loan obligations were imposed on her.  Likewise, over the life of the mortgage, prior to BofA ever creating a new escrow account for Ms. Zahran – and much as BofA desires to have all its customers on escrow accounts to increase its profits -- BofA was obligated to enter into a new signed contract with her, executed and returned to BofA in advance of BofA creating her account.

18.     No federal banking law preempts Ms. Zahran's claim, as a matter of state contract law, that BofA was not entitled to open a mortgage escrow account for her unless she first agreed to it, which, here, she did not, and where she had made her property insurance and tax payments.

19.     Arbitrary and capricious conduct by a large lending institution like BofA in connection with its creation and handling of mortgage escrow accounts also violates trust law and fiduciary law principles traditionally applicable to accounts where funds are held in trust.[5]

---

[5] *E.g.,* Ronald H. Jarashow, The Improper Use of Tax and Insurance Escrow Payments by Mortgages, 25 Cath. U. L. Rev. 102, 124 (1976) ("Viewed in their entirety, the relevant regulatory language, the nature and purpose of the tax and insurance deposits, the banking cases, and the tax case are persuasive evidence that the escrow account should be viewed as a trust.").

6

20. BofA touts its transition to online banking, including online mortgage servicing. The rise of automated and computerized systems for loans and loan servicing increases the potential for unfair, deceptive and abusive creation of unwanted accounts. An important deterrent to the creation of unwanted and unconsented-to accounts comes in the form of traditional state law contract principles.[6]

21. As the recitation of facts below reflects, with regard to Ms. Zahran:

a. BofA created and opened an escrow account for her in November or December 2019 when she had not properly agreed to one or authorized BofA to create one. Ms. Zahran called BofA on November 13, 2019 to request a quote for what an escrow account would cost. BofA proceeded to create one for her improperly. She had been very clear she did not want the account opened. The BofA representative assured her nothing would change unless she signed the paperwork BofA was sending her first. She did not sign that paperwork.

b. BofA's hair trigger approach to opening escrow accounts is intentional. Those accounts are profitable to the bank. And, a consumer confronted with the actual cost of the escrow account may not want to buy one.

c. Further, when Ms. Zahran called BofA on November 13, 2019 merely to inquire about what an escrow account would cost, she advised BofA that she had already paid all of her property insurance premiums for that year. However, BofA then proceeded not only to open an unauthorized account, but on December 13, 2019 to create a negative escrow balance by paying over $1,410 to her property insurer.

d. Ms. Zahran did not become aware that BofA had improperly opened an escrow account for her until BofA began electronically debiting her checking account with her credit union for the higher amount in January 2020.

e. When Ms. Zahran in January 2020 realized that BofA had improperly created an escrow account, she began calling and writing BofA asking for the account to be closed and the improper transaction revoked. BofA refused to acknowledge an error. Rather, BofA took the position that she had verbally contracted to the creation of the escrow account in her phone call on November 13, 2019. However, when she denied making such an agreement by phone, and asked to have the call recording played back to prove it, BofA refused to let her listen to a playback of

---

[6] *Cf.* Edwin S. Mills, The Functioning and Regulation of Escrow Accounts, Housing Policy Debate, Vol. 5, Issue 2, p. 203 (1994) ("About 40 million Americans have mortgages serviced by escrow accounts… escrow accounts are rarely covered by an explicit agreement between borrower and lender and are often poorly understood.").

that phone call, which it admitted it had recorded, and refused to provide her with a copy of that recording.

22.    Ms. Zahran's experience with BofA customer service and call center systems evidences the use of uniform policies that incentivize the hair-trigger creation of escrow accounts and reckless creation of negative balances on those accounts.

23.    Ms. Zahran's experience with BofA customer service and call center systems evidences the use of uniform policies that make it difficult for the consumer to undo the account.

24.    BofA insists she agreed to an escrow via a single phone call it will not produce – a contract it will not let her see.  Meanwhile, BofA has refused to remove the escrow while requiring her to endure phone calls of up to three hours in length that consist in large part of hold time, and that on more than one occasion end with her being placed on hold again in order to be transferred to a separate "back office" "escrow department," with BofA then hanging up on her rather than actually transferring her over.

**B.    Ms. Zahran's personal background.**

25.    Ms. Zahran was born and raised in North Carolina.  After high school, she received a Bachelor of Science degree in Business Administration with a concentration in Management at the University of North Carolina in Greensboro.

26.    From approximately 1989 until 1999 she was employed with Duke Energy where she designed and implemented processes to open a large call center, helped Duke to re-engineer its procedures for various departments and call centers, and assisted with operations matters.

27.    In or about 1999, she took a new position as a manager with responsibility for customer care, training and other areas with Tampa Electric.  In connection with that job, she moved to Florida.

8

28.     Subsequently in or about 2000, she began to lease an apartment unit located at 1002 Normandy Trace Road #1002, Tampa, Florida 33602.  This property was in an attractive development close to the shore.

29.     In 2001, the property developer converted the development into condominiums for purchase.  Ms. Zahran elected to purchase the property and entered into a deed and mortgage transaction to that effect, with the developer, Harbour Place, and the mortgage lender, Wells Fargo, as reflected with instruments recorded with the register of deeds for Hillsborough County, Florida on September 13, 2001.

30.     Subsequently, she entered into home loan refinancing transactions, including in 2003 with Suntrust, in 2007 with Wachovia, and in 2008 with Franklin American, as she sought to manage her mortgage and take advantage of the best available terms.  During this time, she maintained a good record of making her periodic mortgage payments, and paying for her taxes and insurance as appropriate.

31.     Ms. Zahran then relocated from Tampa to Margate, Florida, near Miami, for career reasons.  She decided to continue to own the Tampa property and to rent it to tenants as an investment property to supplement her income.

### C.  Ms. Zahran enters into home loan refinance with BofA in 2013.

32.     In 2013, Ms. Zahran decided to refinance the home loan on the Tampa property once again, this time with Bank of America, taking advantage of the Home Affordable Refinance Program ("HARP"), a government program designed to help homeowners refinance mortgages at more attractive interest rates.[7]

---

[7] See https://www.investopedia.com/articles/personal-finance/112415/harp-loan-program-how-does-it-work.asp.
The program started on April 1, 2009 and ended on December 31, 2018.  Approximately 3.45 million borrowers took advantage of HARP.  *Id.*

33.     Ms. Zahran was aware of terms offered by competitor lenders and chose BofA because it offered loan terms which included a principal amount of $163,300; a fixed interest rate of 4.25%; and a monthly payment of $803.34.  On or about March 28, 2013, she entered into loan number 245570892 with BofA.  This remains the current loan at issue.

34.     If BofA had demanded that Ms. Zahran agree to the creation of an escrow account, at the time she entered into the mortgage, she would not have agreed to the loan.

35.     Because Plaintiff had a long history of being a responsible mortgage consumer and borrower, had good credit, and was able to manage her own affairs including paying taxes and insurance premiums on time, she fell into that category of consumers who could avoid an escrow account and for whom the added cost of an escrow account was not offset by adequate benefits.[8]

36.     The mortgage form includes generic language providing for an escrow account and also providing that the requirement to have such an account could be waived in writing.  Under Section 1 of the instrument's uniform covenants, Ms. Zahran agreed to pay when due the principal and interest on the debt.  In addition, this section stated: "Borrower shall also pay funds for Escrow Items pursuant to Section 3."

37.     Section 3 stated that escrow items included, among other things, property taxes and property insurance premiums.  It added: "Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has

---

[8] *See* Foote 1998, summary ("Some borrowers, however, feel that they can responsibly handle the payments themselves, and object to lenders having free use of the escrow funds they are required to pay.").

Case 3:20-cv-00427-MOC-DSC   Document 1   Filed 08/03/20   Page 10 of 50

been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payments within such time period as Lender may require."

38.     Section 3 also stated: "Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3." Section 15 requires written notice provided in a certain form.  From 2013 to present, BofA has never provided Plaintiff with a written notice of revocation of the escrow waiver.

39.     The HUD-1 Settlement Statement states in part, under Loan Terms: "You do not have a monthly escrow payment for items, such as property taxes and homeowner's insurance."

40.     A Truth in Lending Disclosure Statement recites that Zahran will be paying $803.34 per month, for principal and interest, and as to escrow, $0.00.

41.     BofA and Zahran agreed to an "Escrow Waiver," by which "[BofA] will waive the requirement that [Ms. Zahran] establish and maintain an escrow account … for payment of property taxes, insurance premiums, assessments and other charges as described in the Security Instrument."  Escrow Waiver, ¶ 1.

42.     The "Escrow Waiver" also recites that "[i]n consideration of this Escrow Waiver, [Ms. Zahran] understand[s] the pricing on [her] loan may be higher."  *Id.*, ¶ 2.  That statement, drafted by BofA, infers that if the consumer does agree to the creation of an escrow account, it accrues a significant financial benefit to BofA; as otherwise, in its absence, there would be no need for BofA to increase the basic mortgage payment amount.

43.     The Escrow Waiver was a contract supported by consideration.

44.     The "Escrow Waiver" agreement also recites that "I will pay the full amount of Escrow Items directly, when and where payable, before the date on which they would become

11

delinquent." *Id.*, ¶ 3. From 2013 on, Ms. Zahran paid all property taxes and property insurance premiums that were owed on the Tampa property at issue.

45. The "Escrow Waiver" document recites that BofA "may revoke this Escrow Waiver at any time and enforce the escrow account provisions in my loan documents." Escrow Waiver, ¶ 6. The Escrow Waiver cannot be read to mean that BofA could open an escrow account for Ms. Zahran arbitrarily at any time after the closing, because this would render the agreement illusory; it would be inconsistent with the duty of good faith and fair dealing; it could harm the borrower by imposing escrow charges on a borrower who has been paying property taxes and insurance herself; and for other reasons. Rather, the contract documents are reasonably construed to obligate BofA to continue to allow the consumer to be free of a mortgage escrow account unless the consumer agrees by a new contract to the creation of an escrow account, or, fails to pay the items such as taxes and insurance premiums otherwise covered by the escrow.[9]

46. BofA issued a "Clarity Commitment" dated March 26, 2013. It says: "Your loan does not include an escrow account for items such as property taxes and insurance. You are responsible for paying these items separately from your monthly mortgage payment."

47. Ms. Zahran's payment history under her 2013 mortgage with BofA commenced on or about April 1, 2013 according to a "home loan history statement" subsequently sent to her by BofA on February 11, 2020.

---

[9] *See* Foote 1998, summary ("On many conventional loans, the lender may waive the escrow requirement as long as the lender reserves the right to resume collection of the escrow <u>if there is nonpayment of the items for which escrow had previously been collected.</u>") (emphasis added); p. CRS-2 ("For conventional loans, the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) generally require escrow accounts on first mortgages. If requested by borrowers, lenders may waive the escrow requirement as long as the lenders reserve the right to resume collection of the escrow if there is nonpayment of the items for which escrow had previously been collected.").

12

48.     She made regular monthly mortgage payments in the amount of $803.34 in 2013, 2014, 2015, and then in later 2015, she began also adding an extra $50 amount each month in a further effort to pay down the mortgage (i.e., a total monthly payment of $853.34).

49.     She continued to make her mortgage payments through 2016 and into 2017, when she upped the extra amount she was paying to $100 per month.  In 2018, she went back to $803.34, then in September of that year started adding the extra $50 again on top.

50.     Between 2013 and the end of 2019, she paid over $67,000 to BofA.

   **D.   Ms. Zahran enrolls in BofA "PayPlan 26" program in 2019.**

51.     In February 2019, Ms. Zahran agreed to a enroll in a payment plan on her mortgage. Under the terms of PayPlan 26, she began paying an amount every two weeks, instead of once a month.   The mutually agreed amount of the periodic payment was $426.67.[10]   This amount reflected her default monthly mortgage payment amount of $803.34, plus the $50 per month extra she had been adding, divided by two.

52.     To receive PayPlan 26, she agreed to make one or more up-front, initial payments above and beyond her normal timing of mortgage payments.

53.     To receive PayPlan 26, she agreed that BofA could "automatically draft your home loan payment from your financial institution account biweekly," i.e., she was agreeing to allow periodic automatic electronic drafting of mortgage payment amounts from her relevant personal bank account (with Truliant Federal Credit Union) by BofA.

54.     BofA sent Ms. Zahran a letter dated February 5, 2019, describing that she had "authorized [BofA] to begin drafting on March 8, 2019 and draft every other week on Friday" and

---

[10] See Feb. 5, 2019 letter from BofA to Zahran.

that the "current draft amount will be $426.67, which includes the additional principal amount of $25.00." This disclosure was required under the EFTA.

55. The February 5, 2019 letter added, "[t]his amount can change due to applicable interest or escrow adjustments." This boilerplate provision was inapplicable to her. Her home loan had a fixed rate that could not change and that had not changed over six years. And she could not have any "escrow adjustments," since she had no escrow account.

56. The benefit Ms. Zahran hoped to derive from enrolling in PayPlan 26 was to make 26 mortgage payments a year, instead of the regular 12, which would enable her to pay down her principal balance faster because there would be one extra monthly payment applied yearly. This plan would automatically and electronically draft one-half of her regular monthly payment every other Friday from her checking account, and the two payments were combined to satisfy one full regular monthly installment. Thus, 24 of the 26 bi-weekly payments covered the 12 regular scheduled payments on her loan and the remaining two drafts were combined to create one extra payment to be applied to principle to pay down the balance faster.

57. Plaintiff's PayPlan 26 agreement with BofA included an "Electronic Payment Service Agreement" found on the back side of the February 5, 2019 correspondence from BofA.

58. The "Electronic Payment Service Agreement" only authorized BofA to automatically electronically debit $426.67 from Plaintiff's Truliant checking account, not a greater amount, and certainly not an amount $200 or $300 more higher, as would eventually without her consent occur, violating the EFTA.

59. Under the terms of the February 5, 2019 agreement, Plaintiff's authorized periodic electronic transfer amount could not be increased by BofA above $426.67 to account for a change in escrow amounts because she was not enrolled in an escrow account at all. Thus, there was no

14

basis for BofA to automatically increase Plaintiff's electronic transfer to account for the extra charges associated with an escrow account.

60.     Plaintiff's authorized electronic transfer could not be altered to be greater than $426.67 to account to an adjustment in interest rate, because Plaintiff never had an adjustment to her interest rate since her enrollment in the PayPlan 26 program in February 2019, nor was her underlying mortgage an adjustable rate mortgage.  She had never had an adjustment to her interest rate over the life of the loan (4.25% from 2013 - current), not just since 2019 but since the commencement of the loan.   It was a fixed-rate mortgage.

61.     The February 5, 2019 agreement expressly stated that BofA could add a "**draft fee of $4** that will be deducted separately with each draft" (emphasis in original).  The fact that BofA referenced this $4 fee in explicit boldface reflected BofA's understanding of the disclosure duties imposed on it by the EFTA.   Therefore, $426.67, plus $4 was the only amount BofA could electronically transfer as a pre-authorized amount without obtaining a new agreement with Plaintiff to authorize BofA to electronic payment a higher amount.

62.     The EFTA requirement that banks make clear in-advance disclosures of upcoming amounts of periodic electronic drafts is important because the electronic debiting process removes the intentionality of the step of the consumer writing a check or making a payment by electronic transaction herself.  An ordinary borrower on a budget has cash flow considerations making the individual far more vulnerable to unexpected debits than would be BofA, America's second-largest bank with over $2 trillion in assets.[11]

63.     From February 2019 through early November 2019, BofA electronically debited the agreed amount of $426.67 from Plaintiff's Truliant checking account.

---

[11] https://www.bankrate.com/banking/biggest-banks-in-america/.

**E.  Ms. Zahran requests information about her escrow account options.**

64.     On November 13, 2019, Ms. Zahran telephoned BofA seeking information and a cost quote to see how much it would cost on top of her normal mortgage payment if she were to add a mortgage escrow account for her investment property in Tampa, Florida.  She did not agree to enter into an escrow account with BofA at this time, or at any time.

65.     Her Verizon phone records reflect she made a call that day at 2:09 p.m. to the BofA number, 800-669-6607, and the call lasted 15 minutes.  On information and belief, this was the call where she asked for the quote.

66.     Her call records also reflect a second call that day, at 4:05 p.m., to the BofA number, 800-732-9194, lasting two minutes.  On information and belief, this was a second follow-up call she made to reiterate to BofA that she only wanted an estimate, after she had uploaded her property insurance information onto the BofA portal as BofA had instructed.

67.     BofA representatives promised on these calls that they understood she was only seeking a quote, and they would not open an escrow account and that she had to send back signed paperwork before they would do so.

68.     BofA contends that Ms. Zahran agreed to the opening of an escrow account during her call or calls on November 13, 2013.

69.     As of the date of filing of this complaint, BofA has refused to allow Ms. Zahran to listen to a playback of this call, or, to provide her with a copy of the call recording.  BofA representatives have admitted to her that BofA has a recording of the call.  These practices reflect uniform corporate policies and are unfair and deceptive.

70.     It is unfair and deceptive for Defendant to claim that it was authorized to open a mortgage escrow account for Plaintiff based on a purported agreement formed verbally during a

16

phone call that Defendant has recorded and will not provide her with a copy of. Plaintiff has repeatedly called and written to BofA, beginning as soon as she learned of the existence of the escrow account, complaining to BofA that she never agreed to such an account, and that all she asked for was an estimate.

71.    Plaintiff's intent in calling into the BofA call center and speaking with a customer service representative ("CSR") was only to get information. She certainly did not contemplate being signed up for the product before she even knew how much it would cost. She wanted to see an estimate of the charges in writing and then she would decide. BofA sent her a written proposed escrow agreement which she refused to agree to.

72.    BofA online website resources and its online calculator did not allow her to obtain an estimate for opening an escrow account. On information and belief, this was not because it was impossible to include such an estimate feature on the website, but rather, because BofA knows that if consumers can easily see the charges it causes they will not want to enroll in it.

73.    With regard to the telephone call she made on November 13, 2019 to BofA, Ms. Zahran did not record the call, but BofA did record the call and retains a copy of that recording.

74.    Once Ms. Zahran realized that BofA was asserted the right to open an escrow account based merely on a verbal phone call, she recorded several of the subsequent phone calls she had with BofA. Those recordings reflect that she was placed on hold for periods of time that could run to ten minutes or more. She was repeatedly told that the "escrow department" was in a "back office" that CSRs could not readily communicate with. She was told that BofA had a recording of her November 13, 2019 call; BofA paraphrased what it contended the call recording reflected; yet it would not produce it. During one lengthy call with long hold times, she was advised that the only way BofA could release the call recording was if she got a lawyer involved.

17

Yet after the retained the undersigned and contacted BofA again, BofA still would not give it to her. Her most recent call with BofA consumed three hours, mostly consisting of hold time. During that call, for the first time, she learned that BofA CSRs wrote in call notes that she had advised BofA in November 2019 that she had already paid all her insurance premiums for that year. Despite having this information, BofA nonetheless not only enrolled her in an unwanted escrow account sometime in November or December 2019, but in addition, made a property insurance premium payment of $1,410 that was not due and not necessary. That payment to the insurer by BofA allowed BofA to claim, once she discovered the account's creation and asked it be closed, that BofA could not do so since it had a negative balance.

75.    When Ms. Zahran called BofA on November 13, 2019, she told the person on the phone that she was only seeking information about BofA's escrow account program and that she was not agreeing to have BofA open and start charging her for an escrow account. At that time, her understanding from BofA was that it would be sending her paperwork to show how much her mortgage payment would be increased if BOFA added on an escrow account, and that no escrow account would be opened unless she signed and returned that paperwork to BofA. Plaintiff's expectation that she would be sent a written statement of what the escrow account would cost before entering into it and would sign an agreement before the account was opened, matches what a reasonable consumer would expect.[12]

76.    By November 2019, Ms. Zahran had already fully paid her property insurance premiums for insurance coverage for the year 2019, to Federated National Insurance Co.

---

[12] "Mortgage lenders establish mortgage escrow accounts to collect and hold money they receive from residential mortgage-holders to pay taxes and insurance on mortgaged properties when those payments fall due. The escrow arrangement starts with an estimate of the annual tax or other item to be paid from the account." *Aitken v. Fleet Mortg. Corp.,* 1992 U.S. Dist. LEXIS 1687, *1, 1992 WL 33926 (N.D. Ill. Feb. 12, 1992).

("Federated"). That year, she paid insurance premium payments to Federated as follows: January 11, 2019 -- $553.00; March 28, 2019 -- $267.33; July 2, 2019 -- $267.33; October 13, 2019 -- $267.34. The total amount was $1,355.

77.     On or about the time of her November 13, 2019 phone call, BofA requested that she upload her homeowner's insurance information onto a BofA internet "portal" so that BofA could use it calculate how much an escrow account would cost. Plaintiff did in fact upload homeowner's insurance documentation to BofA's portal.

78.     Because she had already paid in full her premiums for 2019, she uploaded onto the portal documentation reflecting what the upcoming premiums would be for the next year, 2020. Under Federated policy number FE-0000536880-06, the total annual premium that would be due for 2020 would be $1,410.00. However, it was not yet due in full or in part.

**F.  Defendant improperly creates an escrow account.**

79.     Sometime in November or December 2019, Defendant without proper authorization or agreement from the Plaintiff, and without prior proper EFTA disclosure of the higher electronic draft amount that would occur, proceeded to create a new escrow account for her and enroll her in the account and artificially create a significant negative balance in the account thereby making it more difficult to revoke once Ms. Zahran learned of it.

80.     Upon information and belief, compensation, bonuses, performance incentives and/or performance metrics maintained for BofA employees and contractors, including those in its escrow department, are positively impacted by the generation of new escrow accounts.

81.     On December 13, 2019, BofA paid Federated $1,410 as an insurance payment which was not due, and which was not even included in the BofA escrow account disclosure statement which Ms. Zahran did not receive a copy of until January 2020.

82.     Ms. Zahran had already paid her 2019 premiums in full.  And premiums for 2020 were not yet due.  There was no basis for BofA to a) create an escrow account without her knowledge or agreement, then b) create a negative balance of $1,410 on that account on the premise that BofA had to pay her property insurance premium for 2019 or for 2020.

83.     On April 14, 2020, BofA paid another premium payment in the amount of $840. This payment had no basis since Ms. Zahran had not agreed to the escrow account.  It also had no basis since by that time, Ms. Zahran had at BofA's instruction had the payment of $1,410 refunded by Federated to BofA and had made insurance premiums herself to Federated for 2020.

84.     Plaintiff remained unaware that Defendant had enrolled her in the escrow account without her authorization throughout the months of November and December 2019 and into January 2020.  Plaintiff first learned that Defendant opened an unauthorized escrow account which it was charging her for in January 2020 when BofA made its first automatic biweekly mortgage payment draft from her Truliant account, on January 10, 2020.

85.     On January 10, 2020, BofA electronically drafted $747.00 out of Plaintiff's Truliant checking account.  However, in connection with PayPlan 26, Plaintiff had only authorized BofA to electronically draft $426.67 from Plaintiff's checking account as a periodic 14-day payment. Plaintiff never authorized or agreed to the $747.00 electronically drafted charge.  This charge was $320 higher than what she had authorized, an increase of 75%, not far from doubling her payment.

86.     On January 10, 2020, Plaintiff received an email notification from Truliant alerting her that $747.00 had been withdrawn from her checking account by BofA.  Plaintiff called that same day to notify BofA that there was an unauthorized electronic transfer on her account that increased her mortgage payment from $426.67 to $747.00.

87. Plaintiff then had a series of calls and communications with BofA as she tried to learn what had occurred and get the improper and costly escrow account revoked. During those communications, Plaintiff learned that BofA took the position that she had agreed to the creation of the escrow account back on November 13, 2019. BofA did not point her to any written agreement that it claimed she had signed in November or December 2019 to authorize the escrow. BofA rested its ability to create the account solely on her purported verbal agreement.

88. On January 13, 2020, Plaintiff spoke to BofA employee Jackie Lawrence, who advised that in BofA's electronic records regarding communications with Plaintiff, there were entries to the effect of "Never returned signed paperwork" and "Said she didn't want to escrow."

89. During the time period of January 13 to 15, 2020, Plaintiff made complaints to BofA, to BofA's Executive Mortgage Servicing Complaints team, and sent a written complaint to the CFPB on January 15.[13]

90. In a letter dated January 21, 2020, BofA responded to Plaintiff's complaint. BofA contended that she had agreed to an escrow account during "conversations you had with our customer service representatives on November 13, 2019." However, to date, BofA has refused repeated requests to provide a copy of its call recordings or even simply to play them back on the phone for Ms. Zahran to hear. Defendant paraphrased what it contended was the content of the phone calls and insisted they were "verbally captured and confirmed accurately" yet at the same time, has contended it cannot release or play back the call recordings.

91. In its letter dated January 21, 2020, BofA stated that even though she had asked to close the account, it could not, because there was a negative balance of $1,410.00 – the negative balance it artificially created by making an unnecessary insurance payment on December 13, 2019.

---

[13] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/4077910.

92.     On January 24, 2020, BofA made a second unauthorized electronic transfer of $747.00 from Plaintiff's checking account into BofA's account without obtaining written authorization of the electronic transfer of money.

93.     After learning that BofA had again electronically debited $747.00 from her Truliant account without her authorization, Plaintiff called BofA to cancel her participation in PayPlan 26, to stop the electronic debits.  Plaintiff began to manually pay BofA her monthly payments as she had done prior to enrolling in PayPlan 26.

94.     On January 27, 2020, Plaintiff called and spoke to a BofA CSR who identified himself as Keith at home loans in Phoenix.  Keith said her account involved employees in a "back office" who "don't have direct contact with the actual clients, with the borrowers."  He said there was a notation on her computer notes for her account that "a request submitted to the back office … around December 13th, 2019" and that "you never signed the letter saying that you wanted the escrow account."  He said he saw an "escrow setup request … back in November of 2019 … November 13th, 2019," that it "looks like you got set up in November of 2019," and that "you were calling in to just, you know, inquire about it … back on November 13th … and … somehow, it got set up at that time."  She was then placed on hold for over four minutes then BofA hung up on her.  That call began at 12:30 p.m. EST.

95.     Undeterred, Ms. Zahran made a second call.  This one started at 1:18 p.m. EST.  She first reached Courtney in Jacksonville.  Courtney confirmed that the escrow department was walled off – "our escrow department is handled through this, through our Home Loans Team … So we don't have a direct number for the escrow team."  She said "a request was submitted to our back-office team to begin escrowing for the account."  Plaintiff asked to speak to a manager.  This then led to a ten-minute-plus hold.  After which, Brooklyn Erdman, a "senior client advocate" got

22

on the phone. She said she saw that the issue was already "escalated" but that they already had "close[d] out that escalation request because the call was already reviewed and determined that it wasn't any kind of bank error. Because from their determination, it wasn't just an inquiry." But, that they could resolve the issue if "we would be able to get the hazard insurance payment that we sent out, back in December, back." That was referring to the December 13, 2019 BofA payment of $1,410 which created the negative balance. In short, BofA was using the artificially created, and, from an ordinary consumer's standpoint, significant debt, as a barrier blocking the consumer from getting off the escrow, much as a payday lender will use the principal loan debt as a barrier to funnel the borrower into continuing to make interest payments.

96.     Regarding BofA's continued insistence that Plaintiff agreed to the escrow account being opened in her original November 13, 2019 call, Plaintiff asked, "I want to hear the call because that is not true. So I want to hear the call in which that decision was made, where that decision was made, where you guys say that I did accept that. Because I did not. That is not true." Brooklyn responded that she, Brooklyn, could "review the call again." Ms. Zahran asked,

MS. ZAHRAN: The call is my voice, so send me the call.

MS. ERDMAN: Right.

MS. ZAHRAN: Let's listen to it together. How about that?

MS. ERDMAN: Unfortunately, we wouldn't be able to release the recorded call. Just for legal purposes, the only way that we would be able to do that is if we got an attorney involved. That, by chance, I'm not too sure if you're willing to do.

Subsequently Ms. Zahran did get an attorney, retaining the undersigned, and then she and the undersigned asked again. BofA again denied the request. Plaintiff also said:

MS. ZAHRAN: … I don't have double my mortgage payment. And, in fact, find the call where I then called back and said I'm just making sure nothing is going to get changed. There should be a recorded call for that phone call. And I was assured

nothing would get changed. And I'm not upset with you, specifically. I'm so upset with Bank of America because what they're doing is not okay. And I specifically said I'm making sure that nothing will get changed. Oh, no, we have to have the signed paperwork. You're going to get paperwork that's going to show the amount. And then, you have to sign it in order for anything to get changed. I said great, I want to get the paperwork…. So let's pull that recorded call and listen to it together….

MS. ERDMAN: Okay. So again, I can pull up the call and listen to it but, unfortunately, it's not something I would be able to play over the phone.

97. On or about January 30, 2020, Plaintiff made arrangements to pay her first periodic payment on her 2020 property insurance premium. She paid $590 to Federated, so that Federated would refund to BofA the $1,410 that BofA had paid to Federated in December 2019 for Plaintiff's homeowner's insurance.

98. On January 30, 2020, Plaintiff called and spoke to Ms. Erdman again. Ms. Zahran asked, "aren't you guys required to have paperwork signed before you make changes to somebody's account?" As to opening an escrow account in the midst of a mortgage, aka an "escrow setup," Ms. Erdman described that BofA's policy was that "with the escrow set up, the only time a documentation is required is at the beginning of the loan. If you decide to call in to us and request for the escrow setup, that is just done verbally. And then, we send out documentation afterwards when it's already done. Since all of our calls are recorded, that is all that we would need for documentation purposes." This uniform corporate policy is unfair and deceptive since a) the escrow account requires advance signed written disclosure and a contract, and b) BofA refuses to play back the call recordings.

99. Ms. Erdman also described that she had gone back and listened to the old call recordings, and according to her, "on the initial call, yes, we were inquiring about the escrow setup, and we were actually confirming the escrow to be set up." But then "on the next call, when you

24

were saying, hey, no, I don't want to do this anymore" but "at that point, it was already set up." These statements reflect that BofA uses a uniform corporate policy of enrolling consumers in new accounts on a hair-trigger basis.

100. After BofA received back the refund of $1,410, BofA agreed that now, the balance on the escrow account was zero. However, by letter dated February 25, 2020, BofA stated that it still would not close the escrow account, because Ms. Zahran's LTV ratio did not meet its criteria.

101. On February 25, 2020, Ms. Zahran paid her property taxes of $4,273, as reflected by records of the Hillsborough County tax collector in Florida.

102. On March 27, 2020, Federated sent an insurance invoice reflecting that the minimum premium due was $286.67 by April 17, 2020. Optionally, the consumer could pay the full premium that remained due for the year, which came to $840.

103. Ms. Zahran continued to make phone and email communications to BofA seeking to have BofA undo the improper escrow arrangement. This process was exhausting to Ms. Zahran, who is a single woman, and who does not have over 100,000[14] employees. This entire process, heavily automated and well-staffed at BofA's end, was physically and mentally exhausting at Ms. Zahran's end. Ms. Zahran is a single individual who lives alone.

104. On April 14, 2020, BofA unnecessarily paid Federated $840 as a homeowner's insurance premium. On April 16, 2020, BofA issued an account statement reflecting this as a negative amount on the account.

105. Once again, Plaintiff had to go through the process of contacting Federated and having it on May 7, 2020 issue a check in the amount of $840 refunding to BofA Plaintiff's homeowner's insurance payment that BofA should not have made.

---

[14] https://www.statista.com/statistics/250220/ranking-of-united-states-banks-by-number-of-employees-in-2012/.

106.    The advent of COVID-19 has increased Plaintiff's economic vulnerability.  At the time the pandemic hit, she was working primarily for a service industry employer who had to suspend its relevant operations due to the virus.

107.    Since in or about April 2020, Plaintiff, like four million[15] other Americans, has been provided mortgage loan forbearance in light of COVID-19.  Defendant has represented to Plaintiff in writing that her next mortgage payment will not be due until January 2021.  However, the periodic statements send by Defendant on her mortgage continue to reflect improper and unauthorized mortgage escrow account charges.[16]

### G. **Additional background on Defendant.**

108.    Defendant has had a history of significant large-cohort problems and abuses in its consumer lending sector in general and its consumer mortgage servicing sector in particular.

109.    In a Consent Order dated 2011, the Comptroller of the Currency of the United States of America, through national bank examiners and staff of the Office of the Comptroller of the Currency ("OCC"),[17] conducted an examination of the residential mortgage foreclosure processes

---

[15] https://www.cnbc.com/2020/07/15/privately-held-mortgage-forbearance-may-be-difficult-for-americans-to-navigate.html

[16] BofA has been subject of repeated claims of poor customer service and improper mortgage loan servicing practices.  *See Harryman v. BAC Home Loans Servicing, LP*, No. 6:10-cv-00051 (S.D. Tex. June 29, 2010 complaint filed) (alleging a "systematic home loan servicing scheme that includes hours of telephone runaround, misleading and inconsistent information, lost correspondence, verbal abuse, and extensive delay"); *In the matter of Bank of America, N.C., Charlotte NC*, No. AA-EC-11-12, U.S. Department of the Treasury, Comptroller of the Currency, Consent Order dated April 13, 2011 (requiring BAC to retain an independent consultant to review residential mortgage foreclosure sales, actions, or proceedings for loans serviced by BAC from 2009 to 2010), https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf; *Hall v. Bank of America, N.A.*, No. 1:12-cv-22700-FAM (S.D. Fl.) (complaint filed July 24, 2012) (alleging that Bank of America and BAC Home Loans are among the nation's largest residential mortgage lenders and loan servicers and use their control over Plaintiff's and Class Members' mortgage accounts to reap substantial undisclosed and unearned profits from force-placed insurance); *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185 (9th Cir. 2018), *cert. denied by Bank of Am. v. Lusnak*, 2018 U.S. LEXIS 6824 (U.S., Nov. 19, 2018) (class action regarding BofA keeping mortgage escrow account interest in states that did not so allow).

[17] The OCC has supervisory responsibility for national banks under the National Bank Act of 1864, codified at 12 U.S.C. § 1 *et seq.* ("NBA"). BofA is a national bank chartered by the OCC.

26

of BofA, and "identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings."[18]

110. The OCC alleged as reflected in the 2011 Consent Order, among other things, that BofA "failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes;" and "failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training…."[19]

111. OCC and BofA entered into an Amendment to the Consent Order dated February 28, 2013 that required the bank to make a cash payment to a Qualified Settlement Fund and to take other loss mitigation or foreclosure prevention action.[20] BofA was to make a cash payment of $96,540,359.00 into a Qualified Settlement Fund from which payments to certain borrowers who had a pending or completed foreclosure on their primary residence any time from January 1, 2009 to December 31, 2010, would be made pursuant to a distribution plan developed by the OCC.[21]

112. On June 16, 2015, the 2011 consent order expired. However, the 2011 consent order did not result in an end to improper mortgage servicing practices by BofA.

113. The banking industry has long provided its low-level employees with financial incentives for signing customers up for various types of bank-sponsored accounts. Over the past several years, these types of incentive program have led to bank employees opening unauthorized accounts for customers, so that the employees can exceed sales quota benchmarks set by the banks.

   a. For example, under pressure to exceed sales quotas, Wells Fargo bank employees were revealed to have surreptitiously opened millions of savings and checking accounts in the names of actual customers, without their

---

[18] See *In re Bank of America, N.A.,* No. AA-EC-11-12, OCC Consent Order dated April 13, 2011.
[19] *Id.*
[20] https://www.occ.gov/static/enforcement-actions/ea2015-059.pdf
[21] https://www.occ.gov/static/enforcement-actions/ea2013-130.pdf

knowledge or consent. This conduct resulted in a $100 million dollar fine by the CFPB,[22] as well as obligations to pay $6.1 million in customer refunds, $142 million in customer compensation in a consumer class action settlement, $480 million settlement to resolve a shareholder class action lawsuit, $575 million under a 50-state Attorneys General settlement, and $3 billion to the U.S. Justice Department and Securities and Exchange Commission.

b. Defendant, like Wells Fargo, incentivizes its lower-level employees based on how many new BofA accounts are opened.[23]

c. BofA sales associates may earn between 30 and 50 percent of their total pay from performance bonuses tied to a point system, where incentive points are earned for meeting various sales quotas, and the number of points varies according to, among other things, the products sold, the branch customer satisfaction levels, and local market demographics.[24]

114. On November 7, 2016, Harrington Investments submitted a shareholder proposal to BofA, asking it to include a report in its 2017 proxy statement for its 2017 Annual Meeting of Stockholders analyzing whether BofA's compensation and incentives policies relating to low-level employees may create pressures exposing BofA to an aggregate of material losses, and analyzing the categories of incentives or activities posing greatest risk.[25] BofA argued that it could exclude that information from its 2017 Proxy Materials under the Securities Exchange Act of 1934 because the request was vague and it deals with matters relating to BofA's ordinary business operations. As a result, BofA submitted a No-Action Request to the Division of Corporation Finance of the Securities and Exchange Commission ("SEC"). The SEC ultimately declared that Harrington Investments inventive program proposal could be excluded from the 2017 proxy under the ordinary business operations exception because the request relates to general compensation matters, and

---

[22] See CFPB, press release, "Consumer Financial Protection Bureau Fines Wells Fargo $100 Million for Widespread Illegal Practice of Secretly Opening Unauthorized Accounts," Sept. 8, 2016.
[23] Stefan H. Thomke, Experimentation Matters: Unlocking the Potential of New Technologies for Innovation. Boston, MA: Harvard Business School Press, 2003, at p. 233.
[24] Id.
[25] See letter dated Nov. 7, 2016 from John Harrington to Ross Jeffries, available online at pp. 36-38 of https://www.sec.gov/Archives/edgar/vprr/2017/20170184.pdf.

does not otherwise transcend day-to-day business matters.[26] However, the investors' concerns were not eased by having no information provided.

115. On March 1, 2019, the CFPB issued a civil investigative demand to BofA "as part of an investigation into whether depository institutions or other persons had engaged in unlawful acts or practices in connection with unauthorized consumer bank, credit card, and other accounts."[27] BofA argued that the CFPB's demand for emails and other records was unduly burdensome, and called on the CFPB to close the investigation.[28] In BofA's Petition to set aside the investigative demand, BofA acknowledged that such unauthorized BofA accounts exist, but that the potentially unauthorized accounts in question were, according to them and with no supporting data evident, "a vanishingly small number of such accounts."[29] CFPB Director Kathleen Kraninger denied BofA's request to dismiss the investigation by order dated July 19, 2019.[30] Upon information and belief, the CFPB investigation is currently ongoing.

116. The internet reflects consumer complaints concerning BofA opening unauthorized escrow accounts for its customers. For example, at one public internet complaints website, consumers have written about how BofA was "using the pretext of a fake policy lapse to establish an escrow account … for the purposes of doubling our monthly mortgage payments," and have complained about how the company was "[f]orcing an escrow account which is more than double of what the house insurance and taxes would be."[31]

---

[26] *See id.*
[27] See CFPB website, https://www.consumerfinance.gov/policy-compliance/enforcement/petitions/bank-of-america/.
[28] https://files.consumerfinance.gov/f/documents/201909_cfpb_bank-of-america_petition.pdf.
[29] *Id.* at p. 4.
[30] https://files.consumerfinance.gov/f/documents/201909_cfpb_bank-of-america_decision-and-order-on-petition.pdf.
[31] https://www.complaintsboard.com/bank-of-america-mortgage-fraud-escrow-accounts-c348928.

117.     The CFPB[32] has reported within the putative class period the existence of consumer complaints concerning BofA mortgage servicing practices.

    a.  A January 2017 CFPB monthly complaint report[33] of consumer complaints in the mortgage sector, found that:

        i.  "Consumers stated their efforts to obtain assistance went unresolved as servicers were <u>slow to respond</u>, made repeated requests for documents that had already been submitted, and <u>provided denial reasons that were ambiguous</u>." (Emphasis added).[34]

        ii.  "Consumers reported issues involving <u>escrow account</u> shortages. Some consumers complained that after paying the identified shortage disclosed in the escrow analysis statement, funds were not applied accurately and this resulted in an increase in their monthly payment." (Emphasis added).[35]

        iii.  "Consumers reported issues involving homeowner's insurance and the servicing of the loan accounts. Some consumers reported that they provided proof of hazard insurance coverage to their servicers, but the servicers would not acknowledge receipt and proceeded to purchase insurance and, <u>in some instances, added an escrow account for the collection of insurance premiums</u>." (Emphasis added).[36]

        iv.  The second-most complained-about company was Bank of America.[37]

    b.  The CFPB complaint database reflects numerous consumer complaints that met search criteria filtering for a) conventional home mortgage b) with BofA c) with an escrow issue; and complaints as to long hold times and poor customer service.  Examples:

        i.  Complaint number 4117624, dated Feb. 20, 2020 (describing "wrongly continued escrow account").[38]

---

[32] "The Consumer Financial Protection Bureau (CFPB) is the first federal agency solely focused on consumer financial protection, and consumer complaints are an integral part of that work."  CFPB, January 2017 Monthly Complaint Report, Vol. 19, p. 2, https://files.consumerfinance.gov/f/documents/201701_cfpb_Monthly-Complaint-Report.pdf.
[33] CFPB, January 2017 Monthly Complaint Report, Vol. 19, p. 2; and see information summarized at https://www.consumerfinance.gov/about-us/newsroom/cfpb-monthly-snapshot-spotlights-mortgage-complaints/.
[34] CFPB, January 2017 Monthly Complaint Report, Vol. 19, p. 13.
[35] *Id*., p. 14.
[36] *Id*.
[37] *Id*., p. 18, table 6.
[38] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/4117624.

ii.    Complaint no. 4083413, dated Jan. 16, 2020 (consumer "inquired with Bank of America on how they could be so negligent with my escrow account").[39]

iii.    Complaint no. 4048111, dated Jan. 14, 2020 (complaint about BofA not properly "returning my payments to not include an escrow for taxes and insurance").[40]

iv.    Complaint no. 4090793, dated Nov. 25, 2019 ("There is a scam going on at Bank of America on mortgage payment Center. Bank of America is forcing customers to pay escrow.").[41]

v.    Complaint no. 3984321, dated Sept. 5, 2019 ("Bank of America, without notice inappropriately paid my real estate taxes and initiated an escrow account for my loan against my requests and demands.").[42]

vi.    Complaint no. 3918603, dated Aug. 23, 2019 ("The problem is with my escrow account.").[43]

vii.    Complaint no. 2711008, dated Oct. 24, 2017 ("I currently have a Bank of America mortgage and am unable to contact 'customer service' for any assistance on my loan or impound account. On [date], I was 'on hold' [for] hours trying to reach a representative to ask a simple question about my impound account and finally got disconnected from their phone bank.").[44]

118.    During the pertinent times, BofA has relied on an extensive customer communications system.

a.    It includes call centers that use automated features, call scripts for customer service representatives, uniform policies and procedures for "escalating" a customer complaint to the next higher level of management, and documentation of customer complaints on a call log or by routine call recording.

---

[39] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/4083413.
[40] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/4048111.
[41] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/4090793.
[42] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3984321.
[43] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3918603.
[44] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/2711008.

b. The system routinely tracks call metrics such as how long a call takes, how much of that is hold time, what is said on the call, who else may be involved in it by way of the original point of contact CSR transferring the call to another BofA employee or representative, etc.

c. The system routinely tracks information regarding both the process of the customer calls and the content of those calls.

i. The system can be searched, sampled and audited for metrics including calls pertaining to specific subjects, for example, mortgage escrow accounts; and for whether the subject of a call had to do with a customer seeking to obtain an add-on product like a mortgage escrow account, versus, a customer seeking to terminate or end such an add-on product.

d. The system is structured in a way that unfairly and deceptively unilaterally benefits BofA and belies its representations made to customers, investors and the general public regarding customer-centric policies.

e. BofA structures its system such that unnecessarily impediments are put up to make it more difficult for an ordinary reasonable customer to end or terminate a mortgage escrow account once one is commenced.

f. BofA structures its system such that it can and will enroll a customer in an add-on such as a mortgage escrow account quickly, to the point of operating as a hair-trigger and even causing customers to receive, be enrolled in and be charged for the add-on before the customer has even agreed to receive it.

## V. Class allegations.

119. The class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). "The Bank is among the largest servicers of residential mortgages in the United States, and services a portfolio of 13,500,000 residential mortgage loans." [45]

120. There are questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). Ms. Zahran's claim involves issues that are susceptible to common evidence and proof and that affect other putative members of a class of similarly-situated mortgage consumers in a similar manner. The common issues include:

---

[45] See *In re Bank of America, N.A.,* No. AA-EC-11-12, OCC, Consent Order dated April 13, 2011, and materials available at https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.

32

a. whether at the time the escrow accounts are opened for borrowers, the Defendant had properly documented the borrower's contractual agreement to the creation of the escrow account under relevant state law;

b. whether the escrow accounts are in accordance with applicable state and federal law, including but not limited to the EFTA and RESPA;

c. whether a property insurance or tax payment occurred when an application for an escrow account was under consideration by the consumer; or when the loan had not been in default due to borrower failure to pay property insurance premiums, property taxes or other relevant items for a sufficient period of time to authorize imposition of an escrow account pursuant to the terms of the mortgage loan documents and related agreements;

d. whether, with respect to ongoing escrow accounts (whether authorized or unauthorized by the borrower), the procedures followed with respect to the Defendant as to advancing property insurance or tax payments (including the calculation of the due date, the amounts due, and due diligence to ensure the borrower had not independently paid it) were in accordance with the terms of the mortgage loan and state law requirements;

e. whether a borrower escrow account were overcharged;

f. whether escrow accounts were opened after inadequate confirmation of borrower informed consent to the creation of the account, based on the policies and procedures used by the Defendant's call centers and escrow department;

g. whether obstruction by Defendant of borrower requests to close unwanted accounts was excessive under the terms of applicable state and federal law;

h. whether Defendant used LTV measures to deny borrower requests to close escrow accounts when those same LTV measures were not sufficient to justify the Defendant in opening the escrow account;

i. whether call center inquiries and contacts and customer service activities with respect to borrower-contested account arrangements were handled in accordance with the requirements of applicable state and federal law, and consistent with the policies and procedures applicable to the Defendant's customer service programs;

j. whether errors, misrepresentations, or other deficiencies resulted in financial injury to consumers;

k.  whether Defendant should be obligated to reform its relevant uniform policies, procedures and practices as to the ongoing servicing by Defendant of home loans for Plaintiff or other similarly-situated mortgagors;[46]

l.  Whether Defendant's compliance risk management systems, including internal controls and policies, allow unfair and deceptive trade practices causing harm to lending consumers and cause violations of consumer protection law;

m.  Whether Defendant's uniform customer service policies and procedures materially increase the rate of violations of consumer protection laws in connection with mortgage servicing to an extent that is unfair and deceptive across a cohort of similar-situated borrowers.

121.    The claims of the representative party are typical of the claims or defenses of the class.  Fed. R. Civ. P. 23(a)(3).

122.    The representative party will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4).

123.    A class action may be maintained because Rule 23(a) is satisfied and the following elements are met:  prosecuting separate actions by individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  Fed. R. Civ. P. 23(b)(1).

124.    In the alternative, a class action may be maintained because Rule 23(a) is satisfied and the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  Fed. R. Civ. P. 23(b)(2).

---

[46] *Compare In re Bank of America, N.A.,* No. AA-EC-11-12, OCC, Consent Order dated April 13, 2011, and materials available at https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.

34

125. In the alternative, a class action may be maintained because Rule 23(a) is satisfied and the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

126. With regard to Fed. R. Civ. P. 23(b)(3), predominance and superiority are demonstrated in light of (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

127. Plaintiff requests certification of a class defined as follows, subject to the Plaintiff's and the Court's ability to modify the class definition as the case proceeds:

a. Class: All borrowers who had mortgage loans serviced by Bank of America, N.A.[47] from August 3, 2016[48] through present.

b. Subclass 1: All borrowers who had mortgage loans serviced by Bank of America, N.A. and who had a mortgage escrow account created after August 3, 2016.

c. Subclass 2: All borrowers who had mortgage loans serviced by Bank of America, N.A. who had a change in their mortgage escrow account automatic debit amount after August 3, 2019.[49]

d. Plaintiffs request certification of a nationwide class. In the alternative, Plaintiff requests certification of a North Carolina statewide class and a Florida statewide class.

---

[47] *Compare Hall v. Bank of Am, N.A.*, No. 1:12-cv-22700-FAM (S.D. Fla. Jun. 18, 2014), Order granting Motion for Preliminary Approval of Class Action Settlement.
[48] *See* N.C. Gen. Stat. § 75-16.2 (four-year statute of limitations).
[49] *See* Electronic Funds Transfer Act, 15 U.S.C. § 1693m(g) (claims alleging violations of the EFTA must be filed "within one year from the date of the occurrence of the violation").

35

## Count I
## Violation of the Electronic Funds Transfer Act
## 15 U.S.C. § 1693, *et seq.*

128.    Plaintiff incorporates by reference the above paragraphs of this Complaint as if restated here in full.

129.    Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a) provides that a "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."

130.    15 U.S.C. § 1693a(9), provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."

131.    Regulation E, 12 C.F.R. § 205.10(b), provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer."

132.    The Federal Reserve Board's Official Staff Commentary to Regulation E, 12 C.F.R. § 205.10(b), Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization." *Id.* at ¶ 10(b), comment 5. The Commentary further provides that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." *Id.* at ¶ 10(b), comment 6.

133.    Under Plaintiff's PayPlan 26 contract with BofA, titled as an Electronic Payment Service Agreement, Plaintiff only authorized BofA or its agents, successors and assigns to automatically electronically debit $426.67 from Plaintiff's Truliant checking account, unless there was a change in applicable interest or escrow adjustments.

36

134.    Plaintiff's authorized electronic transfer to BofA could never be adjusted above or below $426.67 to account for a change in escrow amounts because Plaintiff never authorized an enrollment in BofA's escrow account program. Thus, there was no basis for BofA to automatically increase Plaintiff's electronic transfer to account for an escrow account.

135.    Therefore, $426.67 was the only amount BofA could electronically transfer without getting a separate electronic payment authorization from Plaintiff.

136.    On January 10, 2020, BofA electronically transferred $747.00 out of Plaintiff's Truliant checking account and deposited that amount into a BofA account, as if it was a regular PayPlan 26 payment. Plaintiff never signed a written authorization permitting BofA to directly deposit $747.00 into its account by electronically transferring that money from Plaintiff's Truliant checking account every 14 days as part of the PayPlan 26 program. Plaintiff only signed a written authorization that permits BofA to electronically transfer $426.67 from Plaintiff's checking account to BofA's account every 14 days under the PayPlan 26 program.

137.    Plaintiff did not orally authorize or explicitly authorize in writing a $747.00 electronic reoccurring deposit from her savings account to BofA.  BofA never timely sent Plaintiff a communication that it would be increasing her electronic automatic direct deposit to BofA from $426.67 to $747.00.

138.    On January 10, 2020, Plaintiff received an email notification from Truliant alerting her that $747.00 had been drawn from her checking account by BofA. Plaintiff called BofA that same day to notify BofA of the unauthorized electronic transfer that had increased her payment from $426.67 to $747.00 without any notification or authorization.

139.    On or around January 13, 2020, Plaintiff had made a formal written complaint with BofA's Executive Mortgage Servicing Complaints team to provide notice of the unauthorized

escrow account opening and unauthorized electronic transfer of $747.00 to BofA from Plaintiff's checking account.

140. On January 16, 2020, BofA refunded Plaintiff $747.00 for the unauthorized electronic transfer of money and waived the $4.00 processing fee. However, it would not cancel the escrow account.

141. January 24, 2020, BofA made a second unauthorized electronic transfer of $747.00 from Plaintiff's checking account into BofA's account without obtaining written authorization of the electronic transfer of money.

142. Plaintiff suffered actual damages in the amount of $320.33 as a result of BofA electronically debiting $747.00 on January 24, 2020, instead of the authorized $426.67, and as a result of not receiving a copy of a written authorization signed or similarly authenticated by Plaintiff for Plaintiff's preauthorized electronic fund transfer.

143. Class members likewise suffered actual damages as a result of BofA electronically debiting unauthorized amounts form their accounts to a BofA account, and also suffered actual damages as a result of not receiving a copy of a written authorization signed or similarly authenticated by class members for their preauthorized electronic fund transfer.

144. On January 24, 2020, upon learning that BofA again electronically transferred $747.00 from her Credit Union account without her authorization, Plaintiff called BofA to cancel her participation in the PayPlan 26 automatic electronic payment of her payments. From thereon after, Plaintiff manually paid BofA her monthly payments.

145. Under 12 CFR § 1005.10(d)(1), "[w]hen a preauthorized electronic fund transfer from the consumer's account will vary in amount from the previous transfer under the same authorization or from the preauthorized amount, the designated payee or the financial institution

shall send the consumer written notice of the amount and date of the transfer at least 10 days before the scheduled date of transfer." Defendant failed to abide by this requirement.

146.     BofA has debited Plaintiff and class members' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated for preauthorized electronic transfers from accounts, thereby violating 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), and without providing a copy of a written authorization. Plaintiff and the Class are entitled to actual and/or statutory damages pursuant 15 U.S.C. § 1693m(a)(1) & (2), and to costs and attorneys' fees pursuant to 15 U.S.C. § 1693m(a)(3).

## COUNT II
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. § 75-1.1, *et seq.***

147.     Plaintiff incorporates by reference the above-alleged paragraphs of this Complaint as if restated here in full.

148.     Plaintiff brings this claim individually and on behalf of the other members of the Class for violations of the NCUDTPA.

149.     The NCUDTPA provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1.

150.     During the pertinent times, Defendant has opened escrow accounts, financial accounts, or products in Plaintiff and class members' names without their lawfully-obtained authorization for opening such accounts.

151.     During the pertinent times, Defendant has engaged in a policy of not playing back call recordings or providing copies of those recordings to consumers whose own voices are on those calls, even if they need to hear the playback to resolve a dispute with BofA, and even though

39

current technology and information systems allow BofA to make call recordings available to consumers at a minimal cost to BofA; and despite the fact that in the internet age, the consumers have a property interest in the data that exists in the form of their own captured voices.

152. During the pertinent times, Defendant has engaged in a policy of paying property insurance premiums to third party insurers for customers under mortgage escrow accounts, without performing proper due diligence to ascertain whether the monies should be paid, in order to create a barrier to the consumer cancelling the escrow.

153. During the pertinent times, Defendant has engaged in a policy of using a customer service call center system that walls-off different departments, limits internal information access of front-line customer service representatives, causes long hold times, and unilaterally ends calls, to create a disincentive for customers who are seeking to make choices and take actions that may benefit the individual consumer but cause detriment to BofA's profits.

154. The foregoing unfair and deceptive acts and practices were directed at consumers by BofA.

155. Defendant's violations of RESPA function as a predicate for a claim under Chapter 75,[50] regardless of whether RESPA allows a direct private cause of action.[51]

*156.* 12 C.F.R. § 1024.17 promulgated under RESPA sets out certain requirements for an escrow account that a lender establishes in connection with a mortgage loan. The language of this regulation reflects that it is contemplated that the lender and borrower have entered into an

---

[50] *Mark v. Keycorp Mortg.*, No. 95 C 4878, 1996 U.S. Dist. LEXIS 11675, *14-15 (N.D. Ill. Aug. 8, 1996) ("Mark has adequately alleged both elements of his claim. The sending of statements and bills for the escrow account which misrepresent the amount that may be legally charged is both unfair and deceptive. The mortgagor is at the mercy of its lending institution, he must either pay the bill sent to him or risk an action for default and foreclosure.").

[51] Plaintiff does not allege a RESPA claim for violation of 12 C.F.R. § 1024.17, due to failure to send an escrow account statement in 45 days. *See Zinetti v. Deutsche Bank Nat'l Trust Co.,* 2020 U.S. Dist. LEXIS 11880, 2020 WL 409725 (D. Del. Jan. 24, 2020).

enforceable contract to allow the creation of the account. 12 C.F.R. § 1024.17(b) ("Escrow account means any account that a servicer establishes or controls on behalf of a borrower to pay taxes, insurance premiums (including flood insurance), or other charges with respect to a federally related mortgage loan, including charges that the borrower and servicer have voluntarily agreed that the servicer should collect and pay.") (emphasis added). *See also* 12 U.S.C. § 2605(g) ("If the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due.") (emphasis added). The emphasized language contemplates that any agreement for an escrow account will be a formal written contract agreement. The failure by BofA to specify one was unfair and deceptive and contributed to encourage creation of unauthorized and unwanted consumer accounts on a hair-trigger basis.

157.    12 C.F.R. § 1024.17(g)(2) governs "Time of submission of initial escrow account statement for an escrow account established after settlement." It states that "For escrow accounts established after settlement (and which are not a condition of the loan), a servicer shall submit an initial escrow account statement to a borrower within 45 calendar days of the date of establishment of the escrow account." Here, Defendant violated this provision.

158.    Plaintiff did not receive an initial escrow account statement for an escrow account established after settlement (that was not a condition of the Loan from Defendant) within 45 calendar days of the date of the establishment of the escrow account, which Defendant alleges that Plaintiff opened on or around November 13, 2019. On information and belief, and because these events transpiring for Ms. Zahran occurred pursuant to automated and programmed uniform

41

Defendant policies, processes, software, menus and contact scripts, Defendant systematically has engaged in similar concealment of the initial escrow account statements and relevant disclosures for other customers who have an escrow account opened after settlement.

159. Plaintiff suffered actual damages caused by Defendant not sending Plaintiff an initial escrow account statement, because Defendant electronically debited $747.00, instead of the authorized $426.67. Had Plaintiff received the initial escrow account statement with 45 days of her escrow account opening, she would have had knowledge that an escrow account was opened and would have been aware that she needed to terminate the account before she had monies debited from her Truliant account.

160. Likewise, other Class members have also suffered actual loss and actual damages as a result of Defendant failing to send an initial escrow account statement within 45 days of their escrow account opening.

161. When the Plaintiff interacted with Defendant's call center customer service representatives, and its representatives in its escrow department, and broached the issue of an escrow account, Defendant's representatives interacted with Plaintiff based on the use of marketing materials, telemarketing scripts, call center scripts, decision trees and flowcharts, and employee staffing levels and call hold policies, that caused unfair and deceptive customer service practices. During the pertinent times, Defendants call center CSRs communicated with Plaintiff based on uniform training, policies and procedures, call monitoring, quality control and compliance audits. In the case of Plaintiff, these systems failed, in that the escrow add-on was an optional financial product and its costs and terms were not clearly and prominently disclosed. On information and belief, other putative class members were also harmed by the use of similar uniform policies and procedures.

42

162.    On information and belief, for putative class members, Defendant added on optional products or services without obtaining explicit advance authorization from those consumers as well.  The issue is susceptible to classwide proof based on a review of file data and records to determine that consumers who received additional products or services did not provide timely and adequate written authorization.[52]

163.    BofA's deceptive and unfair trade practices proximately caused actual injury to Plaintiff and class members. Plaintiff and class members suffered monetary loss from being charged and overcharged in escrow accounts.

164.    Plaintiff and the class should be found entitled to an award of actual damages and to mandatory treble damages under N.C. Gen. Stat. § 75-16.

165.    Plaintiff and the class should be found entitled to an award of seek their costs and attorneys' fees as provided in N.C. Gen. Stat. § 75-16.1.

## COUNT III
### Breach of Contract

166.    Plaintiff incorporates by reference the above-alleged paragraphs of this Complaint as if restated here in full.

167.    Plaintiff and Defendant were and remain parties to a valid and enforceable mortgage home loan contract which they entered in 2013.[53]

168.    By purporting to impose a mortgage escrow account on the Plaintiff in the manner as it did, the Defendant in November or December 2019 breached the 2013 contract of the parties.

---

[52] Cf. CFPB mortgage servicing examination procedures, June 2016, pp. 11-12.

[53] The elements of a claim for breach of contract are similar under North Carolina and Florida law.  *See Johnson v. Colonial Life & Accident Ins. Co.,* 173 N.C. App. 365, 369, 618 S.E.2d 867, 870 (2005) ((1) existence of a valid contract; and (2) breach of the terms of that contract); *Woolard v. Davenport*, 166 N.C. App. 129, 134, 601 S.E.2d 319, 322 (2004); *Toomer v. Garrett*, 155 N.C. App. 462, 481-82, 574 S.E.2d 76, 91 (2003); *Friedman v. New York Life Ins. Co*., 985 So.2d 56, 58 (Fla. 4th DCA 2008) (An adequately pled breach of contract action requires three elements: (1) a valid contract; (2) a material breach; and (3) damages).

43

169.     In addition or in the alternative, according to the Defendant, the Plaintiff entered into a verbal contract with the Defendant on November 13, 2019 allowing Defendant to create and open an escrow account, advance payments including $1,400 in property insurance premiums on December 13, 2019, apply that payment to create a negative balance on the escrow account, and charge via automatic electronic drafting of Plaintiff's checking account an over $300 higher ($427 to $747) biweekly mortgage payment starting on January 10, 2020.

170.     When the November 13, 2019 purported verbal contract was formed, both Defendant and Plaintiff resided in North Carolina.  A duty of good faith and fair dealing is implied in every contract.[54]  By using this purported verbal contract as a justification to create havoc in Ms. Zahran's mortgage status and personal finances, while declining to provide a copy of the contract (i.e., the call recording), Defendant breached its duty of good faith and fair dealing.

171.     During the pertinent times, the Plaintiff performed her part of the contractual obligations imposed by the contract.

172.     For putative class members, Defendant violated the terms of their standard mortgage agreements and associated agreements by subsequently enrolling them in escrow accounts without obtaining a valid contractual agreement in advance to do so.

173.     As a direct and proximate result of Defendant's breach of contract, the Plaintiff and putative class members have suffered actual loss and damage and is therefore entitled to recovery of compensatory damages.

---

[54] All parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement. *Maglione v. Aegis Family Health Ctrs.,* 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005).

## COUNT IV
## Unjust Enrichment

174.     Plaintiff incorporates by reference the above-alleged paragraphs of this Complaint as if restated here in full.

175.     In the alternative to the breach of contract claim pled above, under the facts and to the extent the evidence may show, Defendant created and charged to an escrow account for the Plaintiff without first entering into a proper contract with Plaintiff to allow it to do so. Accordingly, Defendant was unjustly enriched.

176.     As a result of BofA's unlawful and deceptive actions, and violations of EFTA and RESPA described hereinabove, BofA was enriched at the expense of Plaintiff and the Class through the payment of unauthorized electronic escrow payments, fees, penalties, and other charges resulting from BofA opening unauthorized BofA escrow accounts, products, and other types of financial accounts.

177.     Under the circumstances, it would be against equity and good conscience to permit BofA to retain the ill-gotten profits or financial benefits that they have received from Plaintiff and the class, in light of the fact that BofA used deceptive and/or unfair practices to open unauthorized banking services, accounts, and products.  It would be unjust and inequitable for BofA to retain the benefit without restitution to Plaintiff and the class for the monies paid to BofA as a result of BofA's practices.

178.     Accordingly, the Plaintiff and class should be awarded equitable remedies including disgorgement, refunds, restitution and/or other equitable relief.

**COUNT V**
**Breach of Fiduciary Duty**

179. Plaintiff incorporates by reference the above-alleged paragraphs of this Complaint as if restated here in full.

180. Under the circumstances, a fiduciary relationship arose as between BofA and Ms. Zahran when BofA determined that after six years of a mortgage relationship devoid of any escrow account or charges, and devoid of any material failure by the Plaintiff to perform her duties to stay current on her property insurance and tax payments, nonetheless, the bank could create a new escrow account for her without proper consent, could advance $1,410 on her behalf in the form of a property insurance premium payment to Federated, and could increase the periodic automatically electronically drafted debited payment amounts from her Truliant checking account by 75%, when the policy premium for 2019 had already paid in full by the Plaintiff herself back in October 2019.

181. In trusting Defendant to advise her regarding her personal private financial situation and information, and confiding to Defendant in a phone call so confidential that Defendant to this day will not provide even her with a copy, Plaintiff reposed and placed a special confidence in Defendant who in equity and good conscience was correspondingly bound to act in good faith and with due regard to the interests of the Plaintiff as the one reposing confidence.[55]

182. BofA held a fiduciary duty toward the Plaintiff with regard to the escrow account it purported to establish on her behalf in order to hold funds in trust.[56]

---

[55] "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013) (citing *Dalton v. Camp,* 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001)). "A fiduciary relationship may arise when there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Id*.

[56] "Generally, in North Carolina . . . there are two types of fiduciary relationships: (1) those that arise from legal relations such as … trustee and *cestui que trust,* [de jure relationships] and (2) those that exist as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other [de facto

46

183. As between the Plaintiff, a single individual, and the Defendant, the second-largest bank in the United States, and with regard to an escrow account created based on a phone call to which only Defendant, not Plaintiff, to this day has access, Defendant holds all the cards.[57]

184. Malfeasance with regard to a mortgage escrow account is a factual basis for a claim for breach of fiduciary duty.[58]

185. Defendant furthermore held fiduciary duties with regard to the putative class, as to escrow accounts established on behalf of class members, and breached its fiduciary duties based on the facts alleged hereinabove as regards the class members.

---

relationships].” *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008).

[57] Only when “one party figuratively holds all the cards – all the financial power or technical information, for example — have North Carolina courts found that the 'special circumstance' of a fiduciary relationship has arisen.” *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.,* 219 N.C. App. 615, 621, 730 S.E.2d 763, 767 (2012).

[58] *Compare Lass v. Bank of Am., N.A.,* 695 F.3d 129, 141 (1st Cir. 2012) (breach of fiduciary duty claim arising out of charges for excessive flood insurance and commissions levied by manager of escrow account); *Mahdavieh v. Suntrust Mortg., Inc.,* 2014 U.S. Dist. LEXIS 47775, 2014 WL 1365425 (S.D. Fla. Apr. 7, 2014) (“While a lender generally does not owe a fiduciary duty to its borrower under Florida law, a fiduciary duty may arise in 'special circumstances' . . . [A]n escrow holder generally owes a fiduciary duty to the parties to the escrow transaction”); *Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 30 (D.D.C. 2014); *Progressive Iron Works Realty Corp. v. E. Milling Co*., 155 Me. 16, 150 A.2d 760, 762 (Me. 1959) (“There is a fiduciary relationship created by and inherent in the nature of an escrow agreement.”); *Hamilton v. Fed. Home Loan Mortg. Corp*., No. 2:13-cv-00414-JAW, 2015 U.S. Dist. LEXIS 2954, 2015 WL 144562, at *18 (D. Me. Jan. 12, 2015) (a fiduciary relationship could arise between a creditor-debtor based on the creation and maintenance of an escrow account); *Crandall v. Bangor Sav. Bank,* No. CV-98-239, 1999 Me. Super. LEXIS 304, 1999 WL 35360329, at *2 (Me. Super. Ct. Nov. 4, 1999); *Poindexter v. Nat'l Mortgage Co*., 1995 WL 242287, at *4 (N.D. Ill. Apr. 24, 1995); *Resolution Trust Corp. v. Holtzman*, 248 Ill. App.3d 105, 112, 187 Ill.Dec. 827, 618 N.E.2d 418, 424 (1993); *Valenza v. Heine*, 1986 WL 15000, at *6 (E.D. Pa.) (lender was trustee over escrow fund and that lender's late payment of real estate taxes was a breach of its duties as fiduciary-escrowee), *aff'd*, 831 F.2d 288 (3rd Cir. 1987); *Choi v. Chase Manhattan Mortg. Co*., 63 F. Supp. 2d 874 (N.D. Ill. 1999) (mortgage escrow account – “Defendants' motions to dismiss … are denied to the extent that those counts represent claims of negligence and breach of fiduciary duty”); *Mark v. Keycorp Mortg*., No. 95 C 4878, 1996 U.S. Dist. LEXIS 11675 (N.D. Ill. Aug. 8, 1996) (“Mark claims KMI breached its fiduciary duty to fairly and truthfully report upon the disposition of his funds, and to demand deposit of only the funds actually required to make escrow payments. KMI argues that there is no fiduciary relationship. However, HN7 New York law regards the escrow relationship as a fiduciary one.”); *George A. Fuller Co. v. Alexander & Reed, Esqs*., 760 F. Supp. 381, 386 (S.D.N.Y. 1991); *Davis v. Dime Sav. Bank of New York, FSB*, 158 A.D.2d 50, 52; 557 N.Y.S.2d 775, 776 (1990).

186.     Defendant's breach of fiduciary duty was a direct and proximate cause of injury and actual damage to the Plaintiff, and to the class members, for which the Plaintiff and class members are entitled to recovery of compensatory damages.

## <u>COUNT VI</u>
### Declaratory and Injunctive relief

187.     Plaintiff incorporates by reference the above-alleged paragraphs of this Complaint as if restated here in full.

188.     Plaintiff requests that the Court declare the respective rights and duties of the parties to her ongoing agreement with Defendant, and provide appropriate declaratory, equitable and injunctive relief with regard to other similarly-situated borrowers and consumers, including:

a.   Requiring Defendant to reform its policies regarding providing call recordings to consumers;

b.   Requiring Defendant to reform its policies regarding confirming a contractual agreement is entered before creating escrow accounts;

c.   Requiring Defendant to reform its policies regarding providing effective and prompt customer service and avoiding long hold times and dropped calls;

d.   Requiring Defendant to reform its policies regarding confirming that property insurance premiums are due and due in the amount at issue before advancing those costs for the consumer so as to increase a negative balance on an escrow account; and

e.   Requiring Defendant to reform its policies regarding when the Defendant can close an escrow account at a consumer's requests in light of applicable LTV measurements.

189.     Under the circumstances which involve a currently ongoing mortgage and mortgage servicing relationship between the parties and a great disparity of power and resources

48

between them, and her Florida property is a unique[59] and major asset for her, injunctive relief is necessary because Plaintiff lacks an adequate remedy at law specifically to preserve the status quo pending the ultimate resolution of the preceding claims.

190.    Plaintiff requests that the Court grant any injunctive, equitable or declaratory relief as may be appropriate under the circumstances.

## **Jury Demand**

Plaintiff respectfully demands trial by jury of all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this case be certified and maintained as a class action and for judgment to be entered against Defendant as follows:

a.  designating Plaintiff as the class representative, and designating the undersigned as class counsel;

b.  certifying the proposed class,

c.  declaring that Defendant under the circumstances should properly be financially responsible for notifying all class members of class notice;

d.  finding that Defendant violated the EFTA, 15 U.S.C. § 1693e(a) and 12 C.F.R. § 205.10(b);

e.  finding that Defendant is liable for unfair and deceptive trade practices under North Carolina law;

f.  finding that Defendant is liable for breach of contract;

g.  finding that Defendant is liable for unjust enrichment;

h.  finding that Defendant is liable for breach of fiduciary duty;

---

[59] *See* 11A Charles Allan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure Civil § 2944, at 89-90 (2d ed. 1995) (injunctive relief appropriate where "defendant's acts pose a threat to some unique property interest") (citing cases).

49

i.  awarding actual, statutory and/or compensatory damages to Plaintiff and all members of the class;

j.  awarding appropriate declaratory, equitable and injunctive relief;

k.  awarding reasonable costs and attorneys' fees;

l.  awarding any pre-judgment or post-judgment interest to which Plaintiff and the class may be entitled; and

m.  granting such other relief as this Honorable Court deems appropriate.

This the 3rd day of August, 2020.

*/s/ John S. Hughes*
Mona Lisa Wallace, NC State Bar # 009201
John S. Hughes, NC State Bar # 22126
Daniel Wallace, NC State Bar # 46480
Wallace & Graham, PA
525 N. Main Street
Salisbury, North Carolina 28144
Telephone: (704) 633-5244
Facsimile: (704) 633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com
dwallace@wallacegraham.com

50