# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| Gina Zahran, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| Bank of America, N.A., | ) ) |
| Defendant. | ) ) ) |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Gina Zahran ("Plaintiff"), through counsel, files her first amended complaint on behalf of herself and all others similarly situated, against Defendant Bank of America, N.A. ("BofA" or "BANA") and alleges:

### I.      Introduction.

1.      "With a value of over $10 trillion, the U.S. mortgage market is the largest consumer financial market in the world."[1]  BofA holds outstanding consumer mortgage loans of $236 billion.[2]  BofA is one of the country's largest banks, and one of the most profitable, with revenues of $91 billion in 2019.[3]  And a home is the most expensive purchase an ordinary consumer will ever make.  BofA has far more power than any individual homeowner.

2.      Given those facts, it is fair to require BofA to treat consumers fairly when it comes to their mortgages, including transparency of information, and, having systems in place to avoid selling customers profitable add-on financial products unless and until the consumer has been

---

[1] Consumer Financial Protection Bureau, CFPB Monthly Snapshot Spotlights Mortgage Complaints, Feb. 8, 2017, available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-monthly-snapshot-spotlights-mortgage-complaints/ (accessed Aug. 3, 2020).
[2]  BofA 2019 Annual Report and Form 10-K, Table 20, Consumer Credit Quality; Table 23, Residential Mortgage – Key Credit Statistics, http://investor.bankofamerica.com/annual-reports-proxy-statements/2019_Annual_Report (accessed Aug. 3, 2020).
[3] BofA 2019 Annual Report and Form 10-K, p. 40.

provided with all the information about the product and given their consent in writing. The experience of Ms. Gina Zahran with her home loan, however, reflects not only her entitlement to damages on her individual claim, but also the existence of multiple uniform bank practices that affect a larger class of other consumers. Those are:

      a.   a policy against promptly playing back call recordings or providing copies of those recordings to consumers whose own voices are on those calls, even if they need to hear the playback to resolve a dispute with BofA, and even though current technology and information systems allow BofA to make call recordings available to consumers at a minimal cost to BofA; and despite the fact that in the internet age, the consumers have a property interest in the data that exists in the form of their own captured voices;

      b.   a policy of enrolling customers in profitable add-on financial products and new accounts without their consent, including opening add-on escrow or impound accounts for ongoing mortgage servicing consumers, without giving them the opportunity to first agree to the purchase of this add-on financial product via informed written consent – despite basic contract-law principles and the ready availability of "e-sign" technology to solve the problem;

      c.   a policy of paying property insurance premiums to third party insurers for customers under mortgage escrow accounts, without performing proper due diligence to ascertain whether the monies should be paid, in order to create a barrier to the consumer cancelling the escrow; and

      d.   a policy of using a customer service call center system that walls-off different departments, limits internal information access of front-line customer service representatives, causes long hold times, and unilaterally ends calls, to create a disincentive for customers who are seeking to make choices and take actions that may benefit the individual consumer but cause detriment to BofA's profits.

     3.      Each of these above-described issues affects a definable class or cohort; each can be proved by evidence in BofA's possession; each may be redressed by damages or equitable relief for ongoing mortgage borrowers. Accordingly, Ms. Zahran brings this action, both to recover on her own claim individually, and to obtain broader relief on behalf of a putative class of other similarly-situated individuals.

**II.**     **<u>The parties.</u>**

4.      Plaintiff, Gina Zahran, is a natural person who is a resident and citizen of North Carolina and who has a primary residence at 10827 Maryfield Lane, Charlotte NC 28277-0129, in Mecklenburg County.

5.      Defendant, Bank of America, N.A. is a national banking association with its principal place of business in North Carolina. It is a citizen of North Carolina, and may be served with process at its Principal Office, 100 North Tryon Street, Charlotte, NC 28255, or c/o its Registered Office, CT Corporation System, 160 Mine Lake Ct Ste 200, Raleigh, NC 27615.  It is a federally chartered bank headquartered in Charlotte. Through its network of branch locations, BofA conducts substantial business in the State and the District.

### III.    Jurisdiction and venue.

6.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 class members, and the aggregate amount in controversy exceeds $5,000,000.  This Court also has jurisdiction under 28 U.S.C. § 1331, in light of the federal question alleged hereinbelow, with supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.

7.      Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in this District because BofA resides in this District and is a resident of North Carolina.

8.      This Court has personal jurisdiction over the parties.

### IV.    Factual allegations.

#### A.  General background.

9.      Upwards of 70% of all consumer home loans today include an escrow account by which the lender adds an extra charge to the monthly mortgage payment, which goes into a special account, to the benefit of the lender via interest accruals.  Lenders from that account pay property insurance premiums and taxes as they come due on the property.  Only a minority of states allow any of that interest to go to the consumer by statute.  In both Florida, where Ms. Zahran's BofA mortgage was originated, and North Carolina, where she resided at the time BofA improperly added an escrow account, the interest from an escrow account is kept by the lender.

10.      Thus, lenders have an incentive to open escrow accounts for home loan borrowers because they get paid more money from the consumer and can profit off what amounts to a non-interest-bearing account.  They have more control to make sure the taxes and insurance on the property stay current.  They are less likely to be threatened by a tax lien asserted by the unpaid government property tax collector, or, face a situation of no insurance coverage if the house burns down or there is some other such event wrecking property value.  Further, lenders can include an extra "cushion" charge in the escrow, even above what may truly be needed to cover taxes and premiums as they come due, thereby increasing the interest accruing to the lender.  For all these reasons, lenders have historically engaged in a series of systematic abuses of escrow accounts that have led to a series of lawsuits and regulatory initiatives seeking to block these abuses.[4]  However, as the legal landscape has evolved, so have the abuses.

11.      For the consumer, the value of the escrow account is more disputable.  Lenders argue that it makes life more convenient for the consumer because she does not have to keep track of when her property tax and insurance premiums are due.  But on the other hand, the effect of the

---

[4] *See* Bruce E. Foote, Mortgage Escrow Accounts: An Analysis of the Issues, Congressional Research Service, Dec. 10, 1998 ("Foote 1998"), pp. CRS-3 (noting enactment of laws after "lobbying and class action suits by consumer groups"); CRS-4 (describing provisions of Real Estate Settlement Procedures Act of 1974 (RESPA) and Regulation X meant to curb escrow abuses); CRS-5 to -8 (amendments to Regulation X in 1990s).

4

escrow account charge added on top of the base mortgage payment means the consumer *does* have to keep track of and stay current on a *larger* home loan payment. In the case of Ms. Zahran, as described further below, the effect of BofA's addition of an improper and unwanted escrow account was to nearly double her mortgage payment.

12. For many consumers, there is no option but to agree to the extra charge of an escrow account. For example, a first-time home buyer, or a buyer with credit issues, may not be able to obtain home loan offers without an escrow.

13. However, for consumers who have better credit or a stronger track record, in the competitive marketplace of mortgage loans and refinancing, they may have the power to obtain a loan without an escrow account. Such was the case for Ms. Zahran in 2013 when she refinanced her mortgage on the condominium property she owns in Florida with BofA.

14. Most generic mortgage forms contain language reciting that the consumer agrees to an escrow account unless it is waived in writing. For those who avoid the escrow, one of the closing documents may be a written and signed escrow waiver. It is a standalone contract. Ms. Zahran entered into such a waiver with BofA at her March 2013 mortgage closing. Accordingly, in a "Clarity Commitment" document BofA issued in connection with the mortgage, BofA stated "Your loan does not include an escrow account for items such as property taxes and insurance. You are responsible for paying the items separately from your monthly mortgage payment."

15. The written escrow waiver agreement Ms. Zahran signed was an enforceable contract. Ms. Zahran performed her end of the contract by paying her property taxes and property insurance premiums each year after 2013.

16. For the escrow waiver agreement to not be illusory, it must be read to mean that BofA will not thereafter (during the mortgage servicing phase) create an escrow account for Ms. Zahran unless creation of that account is based on Ms. Zahran not performing her duty of paying

property taxes and insurance, or, unless she voluntarily agrees in a subsequent contract with BofA to pay for a new escrow account and allow an escrow account to be created by BofA for her.

17.     The 2013 mortgage agreement and the escrow waiver were written signed contracts between the parties that were agreed to by the consumer before loan obligations were imposed on her.  Likewise, over the life of the mortgage, prior to BofA ever creating a new escrow account for Ms. Zahran – and much as BofA desires to have all its customers on escrow accounts to increase its profits -- BofA was obligated to enter into a new signed contract with her, executed and returned to BofA in advance of BofA creating her account.

18.     No federal banking law preempts Ms. Zahran's claim, as a matter of state contract law, that BofA was not entitled to open a mortgage escrow account for her unless she first agreed to it, which, here, she did not, and where she had made her property insurance and tax payments.

19.     Arbitrary and capricious conduct by a large lending institution like BofA in connection with its creation and handling of mortgage escrow accounts also violates trust law and fiduciary law principles traditionally applicable to accounts where funds are held in trust.[5]

20.     BofA touts its transition to online banking, including online mortgage servicing. The rise of automated and computerized systems for loans and loan servicing increases the potential for unfair, deceptive and abusive creation of unwanted accounts.  An important deterrent to the creation of unwanted and unconsented-to accounts comes in the form of traditional state law contract principles.[6]

21.     As the recitation of facts below reflects, with regard to Ms. Zahran:

---

[5] *E.g.,* Ronald H. Jarashow, The Improper Use of Tax and Insurance Escrow Payments by Mortgages, 25 Cath. U. L. Rev. 102, 124 (1976) ("Viewed in their entirety, the relevant regulatory language, the nature and purpose of the tax and insurance deposits, the banking cases, and the tax case are persuasive evidence that the escrow account should be viewed as a trust.").

[6] *Cf.* Edwin S. Mills, The Functioning and Regulation of Escrow Accounts, Housing Policy Debate, Vol. 5, Issue 2, p. 203 (1994) ("About 40 million Americans have mortgages serviced by escrow accounts… escrow accounts are rarely covered by an explicit agreement between borrower and lender and are often poorly understood.").

6

a.    BofA created and opened an escrow account for her in November or December 2019 when she had not properly agreed to one or authorized BofA to create one. Ms. Zahran called BofA on November 13, 2019 to request a quote for what an escrow account would cost. BofA proceeded to create one for her improperly. She had been very clear she did not want the account opened. The BofA representative assured her nothing would change unless she signed the paperwork BofA was sending her first. She did not sign that paperwork.

b.    BofA's hair trigger approach to opening escrow accounts is intentional. Those accounts are profitable to the bank. And, a consumer confronted with the actual cost of the escrow account may not want to buy one.

c.    Further, when Ms. Zahran called BofA on November 13, 2019 merely to inquire about what an escrow account would cost, she advised BofA that she had already paid all of her property insurance premiums for that year. However, BofA then proceeded not only to open an unauthorized account, but on December 13, 2019 to create a negative escrow balance by paying over $1,410 to her property insurer.

d.    Ms. Zahran did not become aware that BofA had improperly opened an escrow account for her until BofA began electronically debiting her checking account with her credit union for the higher amount in January 2020.

e.    When Ms. Zahran in January 2020 realized that BofA had improperly created an escrow account, she began calling and writing BofA asking for the account to be closed and the improper transaction revoked. BofA refused to acknowledge an error. Rather, BofA took the position that she had verbally contracted to the creation of the escrow account in her phone call on November 13, 2019. However, when she denied making such an agreement by phone, and asked to have the call recording played back to prove it, BofA refused to let her listen to a playback of that phone call, which it admitted it had recorded, and refused to provide her with a copy of that recording.

22.    Ms. Zahran's experience with BofA customer service and call center systems evidences the use of uniform policies that incentivize the hair-trigger creation of escrow accounts and reckless creation of negative balances on those accounts.

23.    Ms. Zahran's experience with BofA customer service and call center systems evidences the use of uniform policies that make it difficult for the consumer to undo the account.

24.    BofA insists she agreed to an escrow via a single phone call it will not produce – a contract it will not let her see. Meanwhile, BofA has refused to remove the escrow while requiring her to endure phone calls of up to three hours in length that consist in large part of hold time, and

7

that on more than one occasion end with her being placed on hold again in order to be transferred to a separate "back office" "escrow department," with BofA then hanging up on her rather than actually transferring her over.

## B. Ms. Zahran's personal background.

25.     Ms. Zahran was born and raised in North Carolina.  After high school, she received a Bachelor of Science degree in Business Administration with a concentration in Management at the University of North Carolina in Greensboro.

26.     From approximately 1989 until 1999 she was employed with Duke Energy where she designed and implemented processes to open a large call center, helped Duke to re-engineer its procedures for various departments and call centers, and assisted with operations matters.

27.     In or about 1999, she took a new position as a manager with responsibility for customer care, training and other areas with Tampa Electric.  In connection with that job, she moved to Florida.

28.     Subsequently in or about 2000, she began to lease an apartment unit located at 1002 Normandy Trace Road #1002, Tampa, Florida 33602.  This property was in an attractive development close to the shore.

29.     In 2001, the property developer converted the development into condominiums for purchase.  Ms. Zahran elected to purchase the property and entered into a deed and mortgage transaction to that effect, with the developer, Harbour Place, and the mortgage lender, Wells Fargo, as reflected with instruments recorded with the register of deeds for Hillsborough County, Florida on September 13, 2001.

30.     Subsequently, she entered into home loan refinancing transactions, including in 2003 with Suntrust, in 2007 with Wachovia, and in 2008 with Franklin American, as she sought to manage her mortgage and take advantage of the best available terms.  During this time, she

maintained a good record of making her periodic mortgage payments, and paying for her taxes and insurance as appropriate.

31.     Ms. Zahran then relocated from Tampa to Margate, Florida, near Miami, for career reasons.  She decided to continue to own the Tampa property and to rent it to tenants as an investment property to supplement her income.

### C.  Ms. Zahran enters into home loan refinance with BofA in 2013.

32.     In 2013, Ms. Zahran decided to refinance the home loan on the Tampa property once again, this time with Bank of America, taking advantage of the Home Affordable Refinance Program ("HARP"), a government program designed to help homeowners refinance mortgages at more attractive interest rates.[7]

33.     Ms. Zahran was aware of terms offered by competitor lenders and chose BofA because it offered loan terms which included a principal amount of $163,300; a fixed interest rate of 4.25%; and a monthly payment of $803.34.  On or about March 28, 2013, she entered into loan number 245570892 with BofA.  This remains the current loan at issue.

34.     If BofA had demanded that Ms. Zahran agree to the creation of an escrow account, at the time she entered into the mortgage, she would not have agreed to the loan.

35.     Because Plaintiff had a long history of being a responsible mortgage consumer and borrower, had good credit, and was able to manage her own affairs including paying taxes and insurance premiums on time, she fell into that category of consumers who could avoid an escrow account and for whom the added cost of an escrow account was not offset by adequate benefits.[8]

---

[7] See https://www.investopedia.com/articles/personal-finance/112415/harp-loan-program-how-does-it-work.asp. The program started on April 1, 2009 and ended on December 31, 2018.  Approximately 3.45 million borrowers took advantage of HARP.  *Id.*

[8] *See* Foote 1998, summary ("Some borrowers, however, feel that they can responsibly handle the payments themselves, and object to lenders having free use of the escrow funds they are required to pay.").

36. The mortgage form includes generic language providing for an escrow account and also providing that the requirement to have such an account could be waived in writing. Under Section 1 of the instrument's uniform covenants, Ms. Zahran agreed to pay when due the principal and interest on the debt. In addition, this section stated: "Borrower shall also pay funds for Escrow Items pursuant to Section 3."

37. Section 3 stated that escrow items included, among other things, property taxes and property insurance premiums. It added: "Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payments within such time period as Lender may require."

38. Section 3 also stated: "Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3." Section 15 requires written notice provided in a certain form. From 2013 to present, BofA has never provided Plaintiff with a written notice of revocation of the escrow waiver.

39. The HUD-1 Settlement Statement states in part, under Loan Terms: "You do not have a monthly escrow payment for items, such as property taxes and homeowner's insurance."

40. A Truth in Lending Disclosure Statement recites that Zahran will be paying $803.34 per month, for principal and interest, and as to escrow, $0.00.

41. BofA and Zahran agreed to an "Escrow Waiver," by which "[BofA] will waive the requirement that [Ms. Zahran] establish and maintain an escrow account … for payment of

10

property taxes, insurance premiums, assessments and other charges as described in the Security Instrument." Escrow Waiver, ¶ 1.

42. The "Escrow Waiver" also recites that "[i]n consideration of this Escrow Waiver, [Ms. Zahran] understand[s] the pricing on [her] loan may be higher." *Id.*, ¶ 2. That statement, drafted by BofA, infers that if the consumer does agree to the creation of an escrow account, it accrues a significant financial benefit to BofA; as otherwise, in its absence, there would be no need for BofA to increase the basic mortgage payment amount.

43. The Escrow Waiver was a contract supported by consideration.

44. The "Escrow Waiver" agreement also recites that "I will pay the full amount of Escrow Items directly, when and where payable, before the date on which they would become delinquent." *Id.*, ¶ 3. From 2013 on, Ms. Zahran paid all property taxes and property insurance premiums that were owed on the Tampa property at issue.

45. The "Escrow Waiver" document recites that BofA "may revoke this Escrow Waiver at any time and enforce the escrow account provisions in my loan documents." Escrow Waiver, ¶ 6. The Escrow Waiver cannot be read to mean that BofA could open an escrow account for Ms. Zahran arbitrarily at any time after the closing, because this would render the agreement illusory; it would be inconsistent with the duty of good faith and fair dealing; it could harm the borrower by imposing escrow charges on a borrower who has been paying property taxes and insurance herself; and for other reasons. Rather, the contract documents are reasonably construed to obligate BofA to continue to allow the consumer to be free of a mortgage escrow account unless the consumer agrees by a new contract to the creation of an escrow account, or, fails to pay the items such as taxes and insurance premiums otherwise covered by the escrow.[9]

---

[9] *See* Foote 1998, summary ("On many conventional loans, the lender may waive the escrow requirement as long as the lender reserves the right to resume collection of the escrow <u>if there is nonpayment of the items for which escrow had previously been collected</u>.") (emphasis added); p. CRS-2 ("For conventional loans, the Federal National

46.     BofA issued a "Clarity Commitment" dated March 26, 2013. It says: "Your loan does not include an escrow account for items such as property taxes and insurance. You are responsible for paying these items separately from your monthly mortgage payment."

47.     Ms. Zahran's payment history under her 2013 mortgage with BofA commenced on or about April 1, 2013 according to a "home loan history statement" subsequently sent to her by BofA on February 11, 2020.

48.     She made regular monthly mortgage payments in the amount of $803.34 in 2013, 2014, 2015, and then in later 2015, she began also adding an extra $50 amount each month in a further effort to pay down the mortgage (i.e., a total monthly payment of $853.34).

49.     She continued to make her mortgage payments through 2016 and into 2017, when she upped the extra amount she was paying to $100 per month. In 2018, she went back to $803.34, then in September of that year started adding the extra $50 again on top.

50.     Between 2013 and the end of 2019, she paid over $67,000 to BofA.

**D.  Ms. Zahran enrolls in BofA "PayPlan 26" program in 2019.**

51.     In February 2019, Ms. Zahran agreed to a enroll in a payment plan on her mortgage. Under the terms of PayPlan 26, she began paying an amount every two weeks, instead of once a month. The mutually agreed amount of the periodic payment was $426.67.[10] This amount reflected her default monthly mortgage payment amount of $803.34, plus the $50 per month extra she had been adding, divided by two.

52.     To receive PayPlan 26, she agreed to make one or more up-front, initial payments above and beyond her normal timing of mortgage payments.

---

Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) generally require escrow accounts on first mortgages. If requested by borrowers, lenders may waive the escrow requirement as long as the lenders reserve the right to resume collection of the escrow if there is nonpayment of the items for which escrow had previously been collected.").
[10] See Feb. 5, 2019 letter from BofA to Zahran.

53. To receive PayPlan 26, she agreed that BofA could "automatically draft your home loan payment from your financial institution account biweekly," i.e., she was agreeing to allow periodic automatic electronic drafting of mortgage payment amounts from her relevant personal bank account (with Truliant Federal Credit Union) by BofA.

54. BofA sent Ms. Zahran a letter dated February 5, 2019, describing that she had "authorized [BofA] to begin drafting on March 8, 2019 and draft every other week on Friday" and that the "current draft amount will be $426.67, which includes the additional principal amount of $25.00." This disclosure was required under the EFTA.

55. The February 5, 2019 letter added, "[t]his amount can change due to applicable interest or escrow adjustments." This boilerplate provision was inapplicable to her. Her home loan had a fixed rate that could not change and that had not changed over six years. And she could not have any "escrow adjustments," since she had no escrow account.

56. The benefit Ms. Zahran hoped to derive from enrolling in PayPlan 26 was to make 26 mortgage payments a year, instead of the regular 12, which would enable her to pay down her principal balance faster because there would be one extra monthly payment applied yearly. This plan would automatically and electronically draft one-half of her regular monthly payment every other Friday from her checking account, and the two payments were combined to satisfy one full regular monthly installment. Thus, 24 of the 26 bi-weekly payments covered the 12 regular scheduled payments on her loan and the remaining two drafts were combined to create one extra payment to be applied to principle to pay down the balance faster.

57. Plaintiff's PayPlan 26 agreement with BofA included an "Electronic Payment Service Agreement" found on the back side of the February 5, 2019 correspondence from BofA.

58. The "Electronic Payment Service Agreement" only authorized BofA to automatically electronically debit $426.67 from Plaintiff's Truliant checking account, not a greater

amount, and certainly not an amount $200 or $300 more higher, as would eventually without her consent occur, violating the EFTA.

59.    Under the terms of the February 5, 2019 agreement, Plaintiff's authorized periodic electronic transfer amount could not be increased by BofA above $426.67 to account for a change in escrow amounts because she was not enrolled in an escrow account at all.  Thus, there was no basis for BofA to automatically increase Plaintiff's electronic transfer to account for the extra charges associated with an escrow account.

60.    Plaintiff's authorized electronic transfer could not be altered to be greater than $426.67 to account to an adjustment in interest rate, because Plaintiff never had an adjustment to her interest rate since her enrollment in the PayPlan 26 program in February 2019, nor was her underlying mortgage an adjustable rate mortgage.  She had never had an adjustment to her interest rate over the life of the loan (4.25% from 2013 - current), not just since 2019 but since the commencement of the loan.   It was a fixed-rate mortgage.

61.    The February 5, 2019 agreement expressly stated that BofA could add a "**draft fee of $4 that will be deducted separately with each draft**" (emphasis in original).  The fact that BofA referenced this $4 fee in explicit boldface reflected BofA's understanding of the disclosure duties imposed on it by the EFTA.  Therefore, $426.67, plus $4 was the only amount BofA could electronically transfer as a pre-authorized amount without obtaining a new agreement with Plaintiff to authorize BofA to electronic payment a higher amount.

62.    The EFTA requirement that banks make clear in-advance disclosures of upcoming amounts of periodic electronic drafts is important because the electronic debiting process removes the intentionality of the step of the consumer writing a check or making a payment by electronic transaction herself.  An ordinary borrower on a budget has cash flow considerations making the

individual far more vulnerable to unexpected debits than would be BofA, America's second-largest bank with over $2 trillion in assets.[11]

63.     From February 2019 through early November 2019, BofA electronically debited the agreed amount of $426.67 from Plaintiff's Truliant checking account.

**E.   Ms. Zahran requests information about her escrow account options.**

64.     On November 13, 2019, Ms. Zahran telephoned BofA seeking information and a cost quote to see how much it would cost on top of her normal mortgage payment if she were to add a mortgage escrow account for her investment property in Tampa, Florida.  She did not agree to enter into an escrow account with BofA at this time, or at any time.

65.     Her Verizon phone records reflect she made a call that day at 2:09 p.m. to the BofA number, 800-669-6607, and the call lasted 15 minutes.  On information and belief, this was the call where she asked for the quote.

66.     Her call records also reflect a second call that day, at 4:05 p.m., to the BofA number, 800-732-9194, lasting two minutes.  On information and belief, this was a second follow-up call she made to reiterate to BofA that she only wanted an estimate, after she had uploaded her property insurance information onto the BofA portal as BofA had instructed.

67.     BofA representatives promised on these calls that they understood she was only seeking a quote, and they would not open an escrow account and that she had to send back signed paperwork before they would do so.

68.     BofA contends that Ms. Zahran agreed to the opening of an escrow account during her call or calls on November 13, 2013.

69.     As of the date of filing of this complaint, BofA has refused to allow Ms. Zahran to listen to a playback of this call, or, to provide her with a copy of the call recording.   BofA

---

[11] https://www.bankrate.com/banking/biggest-banks-in-america/.

representatives have admitted to her that BofA has a recording of the call. These practices reflect uniform corporate policies and are unfair and deceptive.

70. It is unfair and deceptive for Defendant to claim that it was authorized to open a mortgage escrow account for Plaintiff based on a purported agreement formed verbally during a phone call that Defendant has recorded and will not provide her with a copy of. Plaintiff has repeatedly called and written to BofA, beginning as soon as she learned of the existence of the escrow account, complaining to BofA that she never agreed to such an account, and that all she asked for was an estimate.

71. Plaintiff's intent in calling into the BofA call center and speaking with a customer service representative ("CSR") was only to get information. She certainly did not contemplate being signed up for the product before she even knew how much it would cost. She wanted to see an estimate of the charges in writing and then she would decide. BofA sent her a written proposed escrow agreement which she refused to agree to.

72. BofA online website resources and its online calculator did not allow her to obtain an estimate for opening an escrow account. On information and belief, this was not because it was impossible to include such an estimate feature on the website, but rather, because BofA knows that if consumers can easily see the charges it causes they will not want to enroll in it.

73. With regard to the telephone call she made on November 13, 2019 to BofA, Ms. Zahran did not record the call, but BofA did record the call and retains a copy of that recording.

74. Once Ms. Zahran realized that BofA was asserted the right to open an escrow account based merely on a verbal phone call, she recorded several of the subsequent phone calls she had with BofA. Those recordings reflect that she was placed on hold for periods of time that could run to ten minutes or more. She was repeatedly told that the "escrow department" was in a "back office" that CSRs could not readily communicate with. She was told that BofA had a

recording of her November 13, 2019 call; BofA paraphrased what it contended the call recording reflected; yet it would not produce it. During one lengthy call with long hold times, she was advised that the only way BofA could release the call recording was if she got a lawyer involved. Yet after the retained the undersigned and contacted BofA again, BofA still would not give it to her. Her most recent call with BofA consumed three hours, mostly consisting of hold time. During that call, for the first time, she learned that BofA CSRs wrote in call notes that she had advised BofA in November 2019 that she had already paid all her insurance premiums for that year. Despite having this information, BofA nonetheless not only enrolled her in an unwanted escrow account sometime in November or December 2019, but in addition, made a property insurance premium payment of $1,410 that was not due and not necessary. That payment to the insurer by BofA allowed BofA to claim, once she discovered the account's creation and asked it be closed, that BofA could not do so since it had a negative balance.

75. When Ms. Zahran called BofA on November 13, 2019, she told the person on the phone that she was only seeking information about BofA's escrow account program and that she was not agreeing to have BofA open and start charging her for an escrow account. At that time, her understanding from BofA was that it would be sending her paperwork to show how much her mortgage payment would be increased if BOFA added on an escrow account, and that no escrow account would be opened unless she signed and returned that paperwork to BofA. Plaintiff's expectation that she would be sent a written statement of what the escrow account would cost before entering into it and would sign an agreement before the account was opened, matches what a reasonable consumer would expect.[12]

---

[12] "Mortgage lenders establish mortgage escrow accounts to collect and hold money they receive from residential mortgage-holders to pay taxes and insurance on mortgaged properties when those payments fall due. The escrow arrangement starts with an estimate of the annual tax or other item to be paid from the account." *Aitken v. Fleet Mortg. Corp.,* 1992 U.S. Dist. LEXIS 1687, *1, 1992 WL 33926 (N.D. Ill. Feb. 12, 1992).

76.     By November 2019, Ms. Zahran had already fully paid her property insurance premiums for insurance coverage for the year 2019, to Federated National Insurance Co. ("Federated"). That year, she paid insurance premium payments to Federated as follows: January 11, 2019 -- $553.00; March 28, 2019 -- $267.33; July 2, 2019 -- $267.33; October 13, 2019 -- $267.34. The total amount was $1,355.

77.     On or about the time of her November 13, 2019 phone call, BofA requested that she upload her homeowner's insurance information onto a BofA internet "portal" so that BofA could use it calculate how much an escrow account would cost. Plaintiff did in fact upload homeowner's insurance documentation to BofA's portal.

78.     Because she had already paid in full her premiums for 2019, she uploaded onto the portal documentation reflecting what the upcoming premiums would be for the next year, 2020. Under Federated policy number FE-0000536880-06, the total annual premium that would be due for 2020 would be $1,410.00. However, it was not yet due in full or in part.

### F.   **Defendant improperly creates an escrow account.**

79.     Sometime in November or December 2019, Defendant without proper authorization or agreement from the Plaintiff, and without prior proper EFTA disclosure of the higher electronic draft amount that would occur, proceeded to create a new escrow account for her and enroll her in the account and artificially create a significant negative balance in the account thereby making it more difficult to revoke once Ms. Zahran learned of it.

80.     Upon information and belief, compensation, bonuses, performance incentives and/or performance metrics maintained for BofA employees and contractors, including those in its escrow department, are positively impacted by the generation of new escrow accounts.

81.     On December 13, 2019, BofA paid Federated $1,410 as an insurance payment which was not due, and which was not even included in the BofA escrow account disclosure statement which Ms. Zahran did not receive a copy of until January 2020.

82.     Ms. Zahran had already paid her 2019 premiums in full.  And premiums for 2020 were not yet due.  There was no basis for BofA to a) create an escrow account without her knowledge or agreement, then b) create a negative balance of $1,410 on that account on the premise that BofA had to pay her property insurance premium for 2019 or for 2020.

83.     On April 14, 2020, BofA paid another premium payment in the amount of $840.  This payment had no basis since Ms. Zahran had not agreed to the escrow account.  It also had no basis since by that time, Ms. Zahran had at BofA's instruction had the payment of $1,410 refunded by Federated to BofA and had made insurance premiums herself to Federated for 2020.

84.     Plaintiff remained unaware that Defendant had enrolled her in the escrow account without her authorization throughout the months of November and December 2019 and into January 2020.  Plaintiff first learned that Defendant opened an unauthorized escrow account which it was charging her for in January 2020 when BofA made its first automatic biweekly mortgage payment draft from her Truliant account, on January 10, 2020.

85.     On January 10, 2020, BofA electronically drafted $747.00 out of Plaintiff's Truliant checking account.  However, in connection with PayPlan 26, Plaintiff had only authorized BofA to electronically draft $426.67 from Plaintiff's checking account as a periodic 14-day payment.  Plaintiff never authorized or agreed to the $747.00 electronically drafted charge.  This charge was $320 higher than what she had authorized, an increase of 75%, not far from doubling her payment.

86.     On January 10, 2020, Plaintiff received an email notification from Truliant alerting her that $747.00 had been withdrawn from her checking account by BofA.  Plaintiff called that

same day to notify BofA that there was an unauthorized electronic transfer on her account that increased her mortgage payment from $426.67 to $747.00.

87.     Plaintiff then had a series of calls and communications with BofA as she tried to learn what had occurred and get the improper and costly escrow account revoked.  During those communications, Plaintiff learned that BofA took the position that she had agreed to the creation of the escrow account back on November 13, 2019.  BofA did not point her to any written agreement that it claimed she had signed in November or December 2019 to authorize the escrow. BofA rested its ability to create the account solely on her purported verbal agreement.

88.     On January 13, 2020, Plaintiff spoke to BofA employee Jackie Lawrence, who advised that in BofA's electronic records regarding communications with Plaintiff, there were entries to the effect of "Never returned signed paperwork" and "Said she didn't want to escrow."

89.     During the time period of January 13 to 15, 2020, Plaintiff made complaints to BofA, to BofA's Executive Mortgage Servicing Complaints team, and sent a written complaint to the CFPB on January 15.[13]

90.     In a letter dated January 21, 2020, BofA responded to Plaintiff's complaint. BofA contended that she had agreed to an escrow account during "conversations you had with our customer service representatives on November 13, 2019."  However, to date, BofA has refused repeated requests to provide a copy of its call recordings or even simply to play them back on the phone for Ms. Zahran to hear.  Defendant paraphrased what it contended was the content of the phone calls and insisted they were "verbally captured and confirmed accurately" yet at the same time, has contended it cannot release or play back the call recordings.

---

[13] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/4077910.

91.     In its letter dated January 21, 2020, BofA stated that even though she had asked to close the account, it could not, because there was a negative balance of $1,410.00 – the negative balance it artificially created by making an unnecessary insurance payment on December 13, 2019.

92.     On January 24, 2020, BofA made a second unauthorized electronic transfer of $747.00 from Plaintiff's checking account into BofA's account without obtaining written authorization of the electronic transfer of money.

93.     After learning that BofA had again electronically debited $747.00 from her Truliant account without her authorization, Plaintiff called BofA to cancel her participation in PayPlan 26, to stop the electronic debits.  Plaintiff began to manually pay BofA her monthly payments as she had done prior to enrolling in PayPlan 26.

94.     On January 27, 2020, Plaintiff called and spoke to a BofA CSR who identified himself as Keith at home loans in Phoenix.  Keith said her account involved employees in a "back office" who "don't have direct contact with the actual clients, with the borrowers."  He said there was a notation on her computer notes for her account that "a request submitted to the back office … around December 13th, 2019" and that "you never signed the letter saying that you wanted the escrow account."  He said he saw an "escrow setup request … back in November of 2019 … November 13th, 2019," that it "looks like you got set up in November of 2019," and that "you were calling in to just, you know, inquire about it … back on November 13th … and … somehow, it got set up at that time."  She was then placed on hold for over four minutes then BofA hung up on her.  That call began at 12:30 p.m. EST.

95.     Undeterred, Ms. Zahran made a second call.  This one started at 1:18 p.m. EST.  She first reached Courtney in Jacksonville.  Courtney confirmed that the escrow department was walled off – "our escrow department is handled through this, through our Home Loans Team … So we don't have a direct number for the escrow team."  She said "a request was submitted to our

back-office team to begin escrowing for the account." Plaintiff asked to speak to a manager. This then led to a ten-minute-plus hold. After which, Brooklyn Erdman, a "senior client advocate" got on the phone. She said she saw that the issue was already "escalated" but that they already had "close[d] out that escalation request because the call was already reviewed and determined that it wasn't any kind of bank error. Because from their determination, it wasn't just an inquiry." But, that they could resolve the issue if "we would be able to get the hazard insurance payment that we sent out, back in December, back." That was referring to the December 13, 2019 BofA payment of $1,410 which created the negative balance. In short, BofA was using the artificially created, and, from an ordinary consumer's standpoint, significant debt, as a barrier blocking the consumer from getting off the escrow, much as a payday lender will use the principal loan debt as a barrier to funnel the borrower into continuing to make interest payments.

96. Regarding BofA's continued insistence that Plaintiff agreed to the escrow account being opened in her original November 13, 2019 call, Plaintiff asked, "I want to hear the call because that is not true. So I want to hear the call in which that decision was made, where that decision was made, where you guys say that I did accept that. Because I did not. That is not true." Brooklyn responded that she, Brooklyn, could "review the call again." Ms. Zahran asked,

MS. ZAHRAN: The call is my voice, so send me the call.

MS. ERDMAN: Right.

MS. ZAHRAN: Let's listen to it together. How about that?

MS. ERDMAN: Unfortunately, we wouldn't be able to release the recorded call. Just for legal purposes, the only way that we would be able to do that is if we got an attorney involved. That, by chance, I'm not too sure if you're willing to do.

Subsequently Ms. Zahran did get an attorney, retaining the undersigned, and then she and the undersigned asked again. BofA again denied the request. Plaintiff also said:

MS. ZAHRAN: … I don't have double my mortgage payment. And, in fact, find the call where I then called back and said I'm just making sure nothing is going to get changed. There should be a recorded call for that phone call. And I was assured nothing would get changed. And I'm not upset with you, specifically. I'm so upset with Bank of America because what they're doing is not okay. And I specifically said I'm making sure that nothing will get changed. Oh, no, we have to have the signed paperwork. You're going to get paperwork that's going to show the amount. And then, you have to sign it in order for anything to get changed. I said great, I want to get the paperwork…. So let's pull that recorded call and listen to it together….

MS. ERDMAN: Okay. So again, I can pull up the call and listen to it but, unfortunately, it's not something I would be able to play over the phone.

97.     On or about January 30, 2020, Plaintiff made arrangements to pay her first periodic payment on her 2020 property insurance premium. She paid $590 to Federated, so that Federated would refund to BofA the $1,410 that BofA had paid to Federated in December 2019 for Plaintiff's homeowner's insurance.

98.     On January 30, 2020, Plaintiff called and spoke to Ms. Erdman again. Ms. Zahran asked, "aren't you guys required to have paperwork signed before you make changes to somebody's account?" As to opening an escrow account in the midst of a mortgage, aka an "escrow setup," Ms. Erdman described that BofA's policy was that "with the escrow set up, the only time a documentation is required is at the beginning of the loan. If you decide to call in to us and request for the escrow setup, that is just done verbally. And then, we send out documentation afterwards when it's already done. Since all of our calls are recorded, that is all that we would need for documentation purposes." This uniform corporate policy is unfair and deceptive since a) the escrow account requires advance signed written disclosure and a contract, and b) BofA refuses to play back the call recordings.

99.     Ms. Erdman also described that she had gone back and listened to the old call recordings, and according to her, "on the initial call, yes, we were inquiring about the escrow setup, and we were actually confirming the escrow to be set up." But then "on the next call, when you

were saying, hey, no, I don't want to do this anymore" but "at that point, it was already set up." These statements reflect that BofA uses a uniform corporate policy of enrolling consumers in new accounts on a hair-trigger basis.

100.    After BofA received back the refund of $1,410, BofA agreed that now, the balance on the escrow account was zero.  However, by letter dated February 25, 2020, BofA stated that it still would not close the escrow account, because Ms. Zahran's LTV ratio did not meet its criteria.

101.    On February 25, 2020, Ms. Zahran paid her property taxes of $4,273, as reflected by records of the Hillsborough County tax collector in Florida.

102.    On March 27, 2020, Federated sent an insurance invoice reflecting that the minimum premium due was $286.67 by April 17, 2020.  Optionally, the consumer could pay the full premium that remained due for the year, which came to $840.

103.    Ms. Zahran continued to make phone and email communications to BofA seeking to have BofA undo the improper escrow arrangement.  This process was exhausting to Ms. Zahran, who is a single woman, and who does not have over 100,000[14] employees.  This entire process, heavily automated and well-staffed at BofA's end, was physically and mentally exhausting at Ms. Zahran's end.  Ms. Zahran is a single individual who lives alone.

104.    On April 14, 2020, BofA unnecessarily paid Federated $840 as a homeowner's insurance premium.   On April 16, 2020, BofA issued an account statement reflecting this as a negative amount on the account.

105.    Once again, Plaintiff had to go through the process of contacting Federated and having it on May 7, 2020 issue a check in the amount of $840 refunding to BofA Plaintiff's homeowner's insurance payment that BofA should not have made.

---

[14] https://www.statista.com/statistics/250220/ranking-of-united-states-banks-by-number-of-employees-in-2012/.

106.    The advent of COVID-19 has increased Plaintiff's economic vulnerability.  At the time the pandemic hit, she was working primarily for a service industry employer who had to suspend its relevant operations due to the virus.

107.    Since in or about April 2020, Plaintiff, like four million[15] other Americans, has been provided mortgage loan forbearance in light of COVID-19.  Defendant has represented to Plaintiff in writing that her next mortgage payment will not be due until January 2021.  However, the periodic statements send by Defendant on her mortgage continue to reflect improper and unauthorized mortgage escrow account charges.[16]

### G.    <u>Additional background on Defendant.</u>

108.    Defendant has had a history of significant large-cohort problems and abuses in its consumer lending sector in general and its consumer mortgage servicing sector in particular.

109.    In a Consent Order dated 2011, the Comptroller of the Currency of the United States of America, through national bank examiners and staff of the Office of the Comptroller of the Currency ("OCC"),[17] conducted an examination of the residential mortgage foreclosure processes

---

[15] https://www.cnbc.com/2020/07/15/privately-held-mortgage-forbearance-may-be-difficult-for-americans-to-navigate.html

[16] BofA has been subject of repeated claims of poor customer service and improper mortgage loan servicing practices.  *See Harryman v. BAC Home Loans Servicing, LP*, No. 6:10-cv-00051 (S.D. Tex. June 29, 2010 complaint filed) (alleging a "systematic home loan servicing scheme that includes hours of telephone runaround, misleading and inconsistent information, lost correspondence, verbal abuse, and extensive delay"); *In the matter of Bank of America, N.C., Charlotte NC*, No. AA-EC-11-12, U.S. Department of the Treasury, Comptroller of the Currency, Consent Order dated April 13, 2011 (requiring BAC to retain an independent consultant to review residential mortgage foreclosure sales, actions, or proceedings for loans serviced by BAC from 2009 to 2010), https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf; *Hall v. Bank of America, N.A.*, No. 1:12-cv-22700-FAM (S.D. Fl.) (complaint filed July 24, 2012) (alleging that Bank of America and BAC Home Loans are among the nation's largest residential mortgage lenders and loan servicers and use their control over Plaintiff's and Class Members' mortgage accounts to reap substantial undisclosed and unearned profits from force-placed insurance); *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185 (9th Cir. 2018), *cert. denied by Bank of Am. v. Lusnak*, 2018 U.S. LEXIS 6824 (U.S., Nov. 19, 2018) (class action regarding BofA keeping mortgage escrow account interest in states that did not so allow).

[17] The OCC has supervisory responsibility for national banks under the National Bank Act of 1864, codified at 12 U.S.C. § 1 *et seq.* ("NBA").  BofA is a national bank chartered by the OCC.

of BofA, and "identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings."[18]

110.    The OCC alleged as reflected in the 2011 Consent Order, among other things, that BofA "failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes;" and "failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training…."[19]

111.    OCC and BofA entered into an Amendment to the Consent Order dated February 28, 2013 that required the bank to make a cash payment to a Qualified Settlement Fund and to take other loss mitigation or foreclosure prevention action.[20]   BofA was to make a cash payment of $96,540,359.00 into a Qualified Settlement Fund from which payments to certain borrowers who had a pending or completed foreclosure on their primary residence any time from January 1, 2009 to December 31, 2010, would be made pursuant to a distribution plan developed by the OCC.[21]

112.    On June 16, 2015, the 2011 consent order expired.  However, the 2011 consent order did not result in an end to improper mortgage servicing practices by BofA.

113.    The banking industry has long provided its low-level employees with financial incentives for signing customers up for various types of bank-sponsored accounts. Over the past several years, these types of incentive program have led to bank employees opening unauthorized accounts for customers, so that the employees can exceed sales quota benchmarks set by the banks.

> a.    For example, under pressure to exceed sales quotas, Wells Fargo bank employees were revealed to have surreptitiously opened millions of savings and checking accounts in the names of actual customers, without their knowledge or consent. This conduct resulted in a $100 million dollar fine by

---

[18] See *In re Bank of America, N.A.,* No. AA-EC-11-12, OCC Consent Order dated April 13, 2011.
[19] *Id.*
[20] https://www.occ.gov/static/enforcement-actions/ea2015-059.pdf
[21] https://www.occ.gov/static/enforcement-actions/ea2013-130.pdf

the CFPB,[22] as well as obligations to pay $6.1 million in customer refunds, $142 million in customer compensation in a consumer class action settlement, $480 million settlement to resolve a shareholder class action lawsuit, $575 million under a 50-state Attorneys General settlement, and $3 billion to the U.S. Justice Department and Securities and Exchange Commission.

b. Defendant, like Wells Fargo, incentivizes its lower-level employees based on how many new BofA accounts are opened.[23]

c. BofA sales associates may earn between 30 and 50 percent of their total pay from performance bonuses tied to a point system, where incentive points are earned for meeting various sales quotas, and the number of points varies according to, among other things, the products sold, the branch customer satisfaction levels, and local market demographics.[24]

114. On November 7, 2016, Harrington Investments submitted a shareholder proposal to BofA, asking it to include a report in its 2017 proxy statement for its 2017 Annual Meeting of Stockholders analyzing whether BofA's compensation and incentives policies relating to low-level employees may create pressures exposing BofA to an aggregate of material losses, and analyzing the categories of incentives or activities posing greatest risk.[25] BofA argued that it could exclude that information from its 2017 Proxy Materials under the Securities Exchange Act of 1934 because the request was vague and it deals with matters relating to BofA's ordinary business operations. As a result, BofA submitted a No-Action Request to the Division of Corporation Finance of the Securities and Exchange Commission ("SEC"). The SEC ultimately declared that Harrington Investments inventive program proposal could be excluded from the 2017 proxy under the ordinary business operations exception because the request relates to general compensation matters, and

---

[22] See CFPB, press release, "Consumer Financial Protection Bureau Fines Wells Fargo $100 Million for Widespread Illegal Practice of Secretly Opening Unauthorized Accounts," Sept. 8, 2016.
[23] Stefan H. Thomke, Experimentation Matters: Unlocking the Potential of New Technologies for Innovation. Boston, MA: Harvard Business School Press, 2003, at p. 233.
[24] Id.
[25] See letter dated Nov. 7, 2016 from John Harrington to Ross Jeffries, available online at pp. 36-38 of https://www.sec.gov/Archives/edgar/vprr/2017/20170184.pdf.

does not otherwise transcend day-to-day business matters.[26] However, the investors' concerns were not eased by having no information provided.

115.    On March 1, 2019, the CFPB issued a civil investigative demand to BofA "as part of an investigation into whether depository institutions or other persons had engaged in unlawful acts or practices in connection with unauthorized consumer bank, credit card, and other accounts."[27] BofA argued that the CFPB's demand for emails and other records was unduly burdensome, and called on the CFPB to close the investigation.[28] In BofA's Petition to set aside the investigative demand, BofA acknowledged that such unauthorized BofA accounts exist, but that the potentially unauthorized accounts in question were, according to them and with no supporting data evident, "a vanishingly small number of such accounts."[29] CFPB Director Kathleen Kraninger denied BofA's request to dismiss the investigation by order dated July 19, 2019.[30] Upon information and belief, the CFPB investigation is currently ongoing.

116.    The internet reflects consumer complaints concerning BofA opening unauthorized escrow accounts for its customers. For example, at one public internet complaints website, consumers have written about how BofA was "using the pretext of a fake policy lapse to establish an escrow account … for the purposes of doubling our monthly mortgage payments," and have complained about how the company was "[f]orcing an escrow account which is more than double of what the house insurance and taxes would be."[31]

117.    The CFPB[32] has reported within the putative class period the existence of consumer complaints concerning BofA mortgage servicing practices.

---

[26] *See id.*
[27] See CFPB website, https://www.consumerfinance.gov/policy-compliance/enforcement/petitions/bank-of-america/.
[28] https://files.consumerfinance.gov/f/documents/201909_cfpb_bank-of-america_petition.pdf.
[29] *Id.* at p. 4.
[30] https://files.consumerfinance.gov/f/documents/201909_cfpb_bank-of-america_decision-and-order-on-petition.pdf.
[31] https://www.complaintsboard.com/bank-of-america-mortgage-fraud-escrow-accounts-c348928.
[32] "The Consumer Financial Protection Bureau (CFPB) is the first federal agency solely focused on

a. A January 2017 CFPB monthly complaint report[33] of consumer complaints in the mortgage sector, found that:

    i. "Consumers stated their efforts to obtain assistance went unresolved as servicers were <u>slow to respond</u>, made repeated requests for documents that had already been submitted, and <u>provided denial reasons that were ambiguous</u>." (Emphasis added).[34]

    ii. "Consumers reported issues involving <u>escrow account</u> shortages. Some consumers complained that after paying the identified shortage disclosed in the escrow analysis statement, funds were not applied accurately and this resulted in an increase in their monthly payment." (Emphasis added).[35]

    iii. "Consumers reported issues involving homeowner's insurance and the servicing of the loan accounts. Some consumers reported that they provided proof of hazard insurance coverage to their servicers, but the servicers would not acknowledge receipt and proceeded to purchase insurance and, <u>in some instances, added an escrow account for the collection of insurance premiums</u>." (Emphasis added).[36]

    iv. The second-most complained-about company was Bank of America.[37]

b. The CFPB complaint database reflects numerous consumer complaints that met search criteria filtering for a) conventional home mortgage b) with BofA c) with an escrow issue; and complaints as to long hold times and poor customer service. Examples:

    i. Complaint number 4117624, dated Feb. 20, 2020 (describing "wrongly continued escrow account").[38]

    ii. Complaint no. 4083413, dated Jan. 16, 2020 (consumer "inquired with Bank of America on how they could be so negligent with my escrow account").[39]

---

consumer financial protection, and consumer complaints are an integral part of that work." CFPB, January 2017 Monthly Complaint Report, Vol. 19, p. 2, https://files.consumerfinance.gov/f/documents/201701_cfpb_Monthly-Complaint-Report.pdf.

[33] CFPB, January 2017 Monthly Complaint Report, Vol. 19, p. 2; and see information summarized at https://www.consumerfinance.gov/about-us/newsroom/cfpb-monthly-snapshot-spotlights-mortgage-complaints/.

[34] CFPB, January 2017 Monthly Complaint Report, Vol. 19, p. 13.

[35] *Id*., p. 14.

[36] *Id.*

[37] *Id*., p. 18, table 6.

[38] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/4117624.

[39] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/4083413.

iii. Complaint no. 4048111, dated Jan. 14, 2020 (complaint about BofA not properly "returning my payments to not include an escrow for taxes and insurance").[40]

iv. Complaint no. 4090793, dated Nov. 25, 2019 ("There is a scam going on at Bank of America on mortgage payment Center. Bank of America is forcing customers to pay escrow.").[41]

v. Complaint no. 3984321, dated Sept. 5, 2019 ("Bank of America, without notice inappropriately paid my real estate taxes and initiated an escrow account for my loan against my requests and demands.").[42]

vi. Complaint no. 3918603, dated Aug. 23, 2019 ("The problem is with my escrow account.").[43]

vii. Complaint no. 2711008, dated Oct. 24, 2017 ("I currently have a Bank of America mortgage and am unable to contact 'customer service' for any assistance on my loan or impound account. On [date], I was 'on hold' [for] hours trying to reach a representative to ask a simple question about my impound account and finally got disconnected from their phone bank.").[44]

118. During the pertinent times, BofA has relied on an extensive customer communications system.

a. It includes call centers that use automated features, call scripts for customer service representatives, uniform policies and procedures for "escalating" a customer complaint to the next higher level of management, and documentation of customer complaints on a call log or by routine call recording.

b. The system routinely tracks call metrics such as how long a call takes, how much of that is hold time, what is said on the call, who else may be involved in it by way of the original point of contact CSR transferring the call to another BofA employee or representative, etc.

c. The system routinely tracks information regarding both the process of the customer calls and the content of those calls.

---

[40] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/4048111.
[41] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/4090793.
[42] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3984321.
[43] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3918603.
[44] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/2711008.

i. The system can be searched, sampled and audited for metrics including calls pertaining to specific subjects, for example, mortgage escrow accounts; and for whether the subject of a call had to do with a customer seeking to obtain an add-on product like a mortgage escrow account, versus, a customer seeking to terminate or end such an add-on product.

d. The system is structured in a way that unfairly and deceptively unilaterally benefits BofA and belies its representations made to customers, investors and the general public regarding customer-centric policies.

e. BofA structures its system such that unnecessarily impediments are put up to make it more difficult for an ordinary reasonable customer to end or terminate a mortgage escrow account once one is commenced.

f. BofA structures its system such that it can and will enroll a customer in an add-on such as a mortgage escrow account quickly, to the point of operating as a hair-trigger and even causing customers to receive, be enrolled in and be charged for the add-on before the customer has even agreed to receive it.

## V. **Class allegations.**

119. The class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). "The Bank is among the largest servicers of residential mortgages in the United States, and services a portfolio of 13,500,000 residential mortgage loans."[45]

120. There are questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). Ms. Zahran's claim involves issues that are susceptible to common evidence and proof and that affect other putative members of a class of similarly-situated mortgage consumers in a similar manner. The common issues include:

a. whether at the time the escrow accounts are opened for borrowers, the Defendant had properly documented the borrower's contractual agreement to the creation of the escrow account under relevant state law;

b. whether the escrow accounts are in accordance with applicable state and federal law, including but not limited to the EFTA and RESPA;

c. whether a property insurance or tax payment occurred when an application for an escrow account was under consideration by the consumer; or when the loan had not been in default due to borrower failure to pay property insurance premiums,

---

[45] See *In re Bank of America, N.A.,* No. AA-EC-11-12, OCC, Consent Order dated April 13, 2011, and materials available at https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.

property taxes or other relevant items for a sufficient period of time to authorize imposition of an escrow account pursuant to the terms of the mortgage loan documents and related agreements;

d.   whether, with respect to ongoing escrow accounts (whether authorized or unauthorized by the borrower), the procedures followed with respect to the Defendant as to advancing property insurance or tax payments (including the calculation of the due date, the amounts due, and due diligence to ensure the borrower had not independently paid it) were in accordance with the terms of the mortgage loan and state law requirements;

e.   whether a borrower escrow account were overcharged;

f.   whether escrow accounts were opened after inadequate confirmation of borrower informed consent to the creation of the account, based on the policies and procedures used by the Defendant's call centers and escrow department;

g.   whether obstruction by Defendant of borrower requests to close unwanted accounts was excessive under the terms of applicable state and federal law;

h.   whether Defendant used LTV measures to deny borrower requests to close escrow accounts when those same LTV measures were not sufficient to justify the Defendant in opening the escrow account;

i.   whether call center inquiries and contacts and customer service activities with respect to borrower-contested account arrangements were handled in accordance with the requirements of applicable state and federal law, and consistent with the policies and procedures applicable to the Defendant's customer service programs;

j.   whether errors, misrepresentations, or other deficiencies resulted in financial injury to consumers;

k.   whether Defendant should be obligated to reform its relevant uniform policies, procedures and practices as to the ongoing servicing by Defendant of home loans for Plaintiff or other similarly-situated mortgagors;[46]

l.   Whether Defendant's compliance risk management systems, including internal controls and policies, allow unfair and deceptive trade practices causing harm to lending consumers and cause violations of consumer protection law;

m.   Whether Defendant's uniform customer service policies and procedures materially increase the rate of violations of consumer protection laws in connection with mortgage servicing to an extent that is unfair and deceptive across a cohort of similar-situated borrowers.

---

[46] *Compare In re Bank of America, N.A.,* No. AA-EC-11-12, OCC, Consent Order dated April 13, 2011, and materials available at https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.

121.    The claims of the representative party are typical of the claims or defenses of the class.  Fed. R. Civ. P. 23(a)(3).

122.    The representative party will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(4).

123.    A class action may be maintained because Rule 23(a) is satisfied and the following elements are met:  prosecuting separate actions by individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  Fed. R. Civ. P. 23(b)(1).

124.    In the alternative, a class action may be maintained because Rule 23(a) is satisfied and the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  Fed. R. Civ. P. 23(b)(2).

125.    In the alternative, a class action may be maintained because Rule 23(a) is satisfied and the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).

126.    With regard to Fed. R. Civ. P. 23(b)(3), predominance and superiority are demonstrated in light of (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability

of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

127.    Plaintiff requests certification of a class defined as follows, subject to the Plaintiff's and the Court's ability to modify the class definition as the case proceeds:

     a.   <u>Class:</u> All borrowers who had mortgage loans serviced by Bank of America, N.A.[47] from August 3, 2016[48] through present.

     b.   <u>Subclass 1</u>: All borrowers who had mortgage loans serviced by Bank of America, N.A. and who had a mortgage escrow account created after August 3, 2016.

     c.   <u>Subclass 2</u>: All borrowers who had mortgage loans serviced by Bank of America, N.A. who had a change in their mortgage escrow account automatic debit amount after August 3, 2019.[49]

     d.   Plaintiffs request certification of a nationwide class.  In the alternative, Plaintiff requests certification of a North Carolina statewide class and a Florida statewide class.

## Count I
## Violation of the Electronic Funds Transfer Act
## 15 U.S.C. § 1693, *et seq.*

128.    Plaintiff incorporates by reference the above paragraphs of this Complaint as if restated here in full.

129.    Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a) provides that a "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."

---

[47] *Compare Hall v. Bank of Am, N.A*., No. 1:12-cv-22700-FAM (S.D. Fla. Jun. 18, 2014), Order granting Motion for Preliminary Approval of Class Action Settlement.
[48] *See* N.C. Gen. Stat. § 75-16.2 (four-year statute of limitations).
[49] *See* Electronic Funds Transfer Act, 15 U.S.C. § 1693m(g) (claims alleging violations of the EFTA must be filed "within one year from the date of the occurrence of the violation").

130.    15 U.S.C. § 1693a(9), provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."

131.    Regulation E, 12 C.F.R. § 205.10(b), provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer."

132.    The Federal Reserve Board's Official Staff Commentary to Regulation E, 12 C.F.R. § 205.10(b), Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization." *Id.* at ¶ 10(b), comment 5. The Commentary further provides that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." *Id.* at ¶ 10(b), comment 6.

133.    Under Plaintiff's PayPlan 26 contract with BofA, titled as an Electronic Payment Service Agreement, Plaintiff only authorized BofA or its agents, successors and assigns to automatically electronically debit $426.67 from Plaintiff's Truliant checking account, unless there was a change in applicable interest or escrow adjustments.

134.    Plaintiff's authorized electronic transfer to BofA could never be adjusted above or below $426.67 to account for a change in escrow amounts because Plaintiff never authorized an enrollment in BofA's escrow account program. Thus, there was no basis for BofA to automatically increase Plaintiff's electronic transfer to account for an escrow account.

135.    Therefore, $426.67 was the only amount BofA could electronically transfer without getting a separate electronic payment authorization from Plaintiff.

136.    On January 10, 2020, BofA electronically transferred $747.00 out of Plaintiff's Truliant checking account and deposited that amount into a BofA account, as if it was a regular

35

PayPlan 26 payment. Plaintiff never signed a written authorization permitting BofA to directly deposit $747.00 into its account by electronically transferring that money from Plaintiff's Truliant checking account every 14 days as part of the PayPlan 26 program. Plaintiff only signed a written authorization that permits BofA to electronically transfer $426.67 from Plaintiff's checking account to BofA's account every 14 days under the PayPlan 26 program.

137.     Plaintiff did not orally authorize or explicitly authorize in writing a $747.00 electronic reoccurring deposit from her savings account to BofA.  BofA never timely sent Plaintiff a communication that it would be increasing her electronic automatic direct deposit to BofA from $426.67 to $747.00.

138.     On January 10, 2020, Plaintiff received an email notification from Truliant alerting her that $747.00 had been drawn from her checking account by BofA. Plaintiff called BofA that same day to notify BofA of the unauthorized electronic transfer that had increased her payment from $426.67 to $747.00 without any notification or authorization.

139.     On or around January 13, 2020, Plaintiff had made a formal written complaint with BofA's Executive Mortgage Servicing Complaints team to provide notice of the unauthorized escrow account opening and unauthorized electronic transfer of $747.00 to BofA from Plaintiff's checking account.

140.     On January 16, 2020, BofA refunded Plaintiff $747.00 for the unauthorized electronic transfer of money and waived the $4.00 processing fee.  However, it would not cancel the escrow account.

141.     January 24, 2020, BofA made a second unauthorized electronic transfer of $747.00 from Plaintiff's checking account into BofA's account without obtaining written authorization of the electronic transfer of money.

142.    Plaintiff suffered actual damages in the amount of $320.33 as a result of BofA electronically debiting $747.00 on January 24, 2020, instead of the authorized $426.67, and as a result of not receiving a copy of a written authorization signed or similarly authenticated by Plaintiff for Plaintiff's preauthorized electronic fund transfer.

143.    Class members likewise suffered actual damages as a result of BofA electronically debiting unauthorized amounts form their accounts to a BofA account, and also suffered actual damages as a result of not receiving a copy of a written authorization signed or similarly authenticated by class members for their preauthorized electronic fund transfer.

144.    On January 24, 2020, upon learning that BofA again electronically transferred $747.00 from her Credit Union account without her authorization, Plaintiff called BofA to cancel her participation in the PayPlan 26 automatic electronic payment of her payments. From thereon after, Plaintiff manually paid BofA her monthly payments.

145.    Under 12 CFR § 1005.10(d)(1), "[w]hen a preauthorized electronic fund transfer from the consumer's account will vary in amount from the previous transfer under the same authorization or from the preauthorized amount, the designated payee or the financial institution shall send the consumer written notice of the amount and date of the transfer at least 10 days before the scheduled date of transfer."  Defendant failed to abide by this requirement.

146.    BofA has debited Plaintiff and class members' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated for preauthorized electronic transfers from accounts, thereby violating 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), and without providing a copy of a written authorization. Plaintiff and the Class are entitled to actual and/or statutory damages pursuant 15 U.S.C. § 1693m(a)(1) & (2), and to costs and attorneys' fees pursuant to 15 U.S.C. § 1693m(a)(3).

## COUNT II

## Violation of the North Carolina Unfair and Deceptive Trade Practices Act
## N.C. Gen. Stat. § 75-1.1, *et seq.*

147.     Plaintiff incorporates by reference the above-alleged paragraphs of this Complaint as if restated here in full.

148.     Plaintiff brings this claim individually and on behalf of the other members of the Class for violations of the NCUDTPA.

149.     The NCUDTPA provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1.

150.     During the pertinent times, Defendant has opened escrow accounts, financial accounts, or products in Plaintiff and class members' names without their lawfully-obtained authorization for opening such accounts.

151.     During the pertinent times, Defendant has engaged in a policy of not playing back call recordings or providing copies of those recordings to consumers whose own voices are on those calls, even if they need to hear the playback to resolve a dispute with BofA, and even though current technology and information systems allow BofA to make call recordings available to consumers at a minimal cost to BofA; and despite the fact that in the internet age, the consumers have a property interest in the data that exists in the form of their own captured voices.

152.     During the pertinent times, Defendant has engaged in a policy of paying property insurance premiums to third party insurers for customers under mortgage escrow accounts, without performing proper due diligence to ascertain whether the monies should be paid, in order to create a barrier to the consumer cancelling the escrow.

153.     During the pertinent times, Defendant has engaged in a policy of using a customer service call center system that walls-off different departments, limits internal information access

of front-line customer service representatives, causes long hold times, and unilaterally ends calls, to create a disincentive for customers who are seeking to make choices and take actions that may benefit the individual consumer but cause detriment to BofA's profits.

154. The foregoing unfair and deceptive acts and practices were directed at consumers by BofA.

155. Defendant's violations of RESPA function as a predicate for a claim under Chapter 75,[50] regardless of whether RESPA allows a direct private cause of action.[51]

*156.* 12 C.F.R. § 1024.17 promulgated under RESPA sets out certain requirements for an escrow account that a lender establishes in connection with a mortgage loan. The language of this regulation reflects that it is contemplated that the lender and borrower have entered into an enforceable contract to allow the creation of the account. 12 C.F.R. § 1024.17(b) ("Escrow account means any account that a servicer establishes or controls on behalf of a borrower to pay taxes, insurance premiums (including flood insurance), or other charges with respect to a federally related mortgage loan, including charges that the borrower and servicer have voluntarily agreed that the servicer should collect and pay.") (emphasis added). *See also* 12 U.S.C. § 2605(g) ("If the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due.") (emphasis added). The emphasized language contemplates that any

---

[50] *Mark v. Keycorp Mortg.*, No. 95 C 4878, 1996 U.S. Dist. LEXIS 11675, *14-15 (N.D. Ill. Aug. 8, 1996) ("Mark has adequately alleged both elements of his claim. The sending of statements and bills for the escrow account which misrepresent the amount that may be legally charged is both unfair and deceptive. The mortgagor is at the mercy of its lending institution, he must either pay the bill sent to him or risk an action for default and foreclosure.").

[51] Plaintiff does not allege a RESPA claim for violation of 12 C.F.R. § 1024.17, due to failure to send an escrow account statement in 45 days. *See Zinetti v. Deutsche Bank Nat'l Trust Co.,* 2020 U.S. Dist. LEXIS 11880, 2020 WL 409725 (D. Del. Jan. 24, 2020).

39

agreement for an escrow account will be a formal written contract agreement. The failure by BofA to specify one was unfair and deceptive and contributed to encourage creation of unauthorized and unwanted consumer accounts on a hair-trigger basis.

157. 12 C.F.R. § 1024.17(g)(2) governs "Time of submission of initial escrow account statement for an escrow account established after settlement." It states that "For escrow accounts established after settlement (and which are not a condition of the loan), a servicer shall submit an initial escrow account statement to a borrower within 45 calendar days of the date of establishment of the escrow account." Here, Defendant violated this provision.

158. Plaintiff did not receive an initial escrow account statement for an escrow account established after settlement (that was not a condition of the Loan from Defendant) within 45 calendar days of the date of the establishment of the escrow account, which Defendant alleges that Plaintiff opened on or around November 13, 2019. On information and belief, and because these events transpiring for Ms. Zahran occurred pursuant to automated and programmed uniform Defendant policies, processes, software, menus and contact scripts, Defendant systematically has engaged in similar concealment of the initial escrow account statements and relevant disclosures for other customers who have an escrow account opened after settlement.

159. Plaintiff suffered actual damages caused by Defendant not sending Plaintiff an initial escrow account statement, because Defendant electronically debited $747.00, instead of the authorized $426.67. Had Plaintiff received the initial escrow account statement with 45 days of her escrow account opening, she would have had knowledge that an escrow account was opened and would have been aware that she needed to terminate the account before she had monies debited from her Truliant account.

160.    Likewise, other Class members have also suffered actual loss and actual damages as a result of Defendant failing to send an initial escrow account statement within 45 days of their escrow account opening.

161.    When the Plaintiff interacted with Defendant's call center customer service representatives, and its representatives in its escrow department, and broached the issue of an escrow account, Defendant's representatives interacted with Plaintiff based on the use of marketing materials, telemarketing scripts, call center scripts, decision trees and flowcharts, and employee staffing levels and call hold policies, that caused unfair and deceptive customer service practices.  During the pertinent times, Defendants call center CSRs communicated with Plaintiff based on uniform training, policies and procedures, call monitoring, quality control and compliance audits.  In the case of Plaintiff, these systems failed, in that the escrow add-on was an optional financial product and its costs and terms were not clearly and prominently disclosed.  On information and belief, other putative class members were also harmed by the use of similar uniform policies and procedures.

162.    On information and belief, for putative class members, Defendant added on optional products or services without obtaining explicit advance authorization from those consumers as well.  The issue is susceptible to classwide proof based on a review of file data and records to determine that consumers who received additional products or services did not provide timely and adequate written authorization.[52]

163.    BofA's deceptive and unfair trade practices proximately caused actual injury to Plaintiff and class members. Plaintiff and class members suffered monetary loss from being charged and overcharged in escrow accounts.

---

[52] Cf. CFPB mortgage servicing examination procedures, June 2016, pp. 11-12.

164. Plaintiff and the class should be found entitled to an award of actual damages and to mandatory treble damages under N.C. Gen. Stat. § 75-16.

165. Plaintiff and the class should be found entitled to an award of seek their costs and attorneys' fees as provided in N.C. Gen. Stat. § 75-16.1.

## COUNT III
### Breach of Contract

166. Plaintiff incorporates by reference the above-alleged paragraphs of this Complaint as if restated here in full.

167. Plaintiff and Defendant were and remain parties to a valid and enforceable mortgage home loan contract which they entered in 2013.[53]

168. By purporting to impose a mortgage escrow account on the Plaintiff in the manner as it did, the Defendant in November or December 2019 breached the 2013 contract of the parties.

169. In addition or in the alternative, according to the Defendant, the Plaintiff entered into a verbal contract with the Defendant on November 13, 2019 allowing Defendant to create and open an escrow account, advance payments including $1,400 in property insurance premiums on December 13, 2019, apply that payment to create a negative balance on the escrow account, and charge via automatic electronic drafting of Plaintiff's checking account an over $300 higher ($427 to $747) biweekly mortgage payment starting on January 10, 2020.

170. When the November 13, 2019 purported verbal contract was formed, both Defendant and Plaintiff resided in North Carolina. A duty of good faith and fair dealing is implied

---

[53] The elements of a claim for breach of contract are similar under North Carolina and Florida law. *See Johnson v. Colonial Life & Accident Ins. Co.,* 173 N.C. App. 365, 369, 618 S.E.2d 867, 870 (2005) ((1) existence of a valid contract; and (2) breach of the terms of that contract); *Woolard v. Davenport*, 166 N.C. App. 129, 134, 601 S.E.2d 319, 322 (2004); *Toomer v. Garrett*, 155 N.C. App. 462, 481-82, 574 S.E.2d 76, 91 (2003); *Friedman v. New York Life Ins. Co.*, 985 So.2d 56, 58 (Fla. 4th DCA 2008) (An adequately pled breach of contract action requires three elements: (1) a valid contract; (2) a material breach; and (3) damages).

in every contract.[54]  By using this purported verbal contract as a justification to create havoc in Ms. Zahran's mortgage status and personal finances, while declining to provide a copy of the contract (i.e., the call recording), Defendant breached its duty of good faith and fair dealing.

171.    During the pertinent times, the Plaintiff performed her part of the contractual obligations imposed by the contract.

172.    For putative class members, Defendant violated the terms of their standard mortgage agreements and associated agreements by subsequently enrolling them in escrow accounts without obtaining a valid contractual agreement in advance to do so.

173.    As a direct and proximate result of Defendant's breach of contract, the Plaintiff and putative class members have suffered actual loss and damage and is therefore entitled to recovery of compensatory damages.

## COUNT IV
### Unjust Enrichment

174.    Plaintiff incorporates by reference the above-alleged paragraphs of this Complaint as if restated here in full.

175.    In the alternative to the breach of contract claim pled above, under the facts and to the extent the evidence may show, Defendant created and charged to an escrow account for the Plaintiff without first entering into a proper contract with Plaintiff to allow it to do so. Accordingly, Defendant was unjustly enriched.

---

[54] All parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement. *Maglione v. Aegis Family Health Ctrs.,* 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005).

176. As a result of BofA's unlawful and deceptive actions, and violations of EFTA and RESPA described hereinabove, BofA was enriched at the expense of Plaintiff and the Class through the payment of unauthorized electronic escrow payments, fees, penalties, and other charges resulting from BofA opening unauthorized BofA escrow accounts, products, and other types of financial accounts.

177. Under the circumstances, it would be against equity and good conscience to permit BofA to retain the ill-gotten profits or financial benefits that they have received from Plaintiff and the class, in light of the fact that BofA used deceptive and/or unfair practices to open unauthorized banking services, accounts, and products. It would be unjust and inequitable for BofA to retain the benefit without restitution to Plaintiff and the class for the monies paid to BofA as a result of BofA's practices.

178. Accordingly, the Plaintiff and class should be awarded equitable remedies including disgorgement, refunds, restitution and/or other equitable relief.

## COUNT V
## Breach of Fiduciary Duty

179. Plaintiff incorporates by reference the above-alleged paragraphs of this Complaint as if restated here in full.

180. Under the circumstances, a fiduciary relationship arose as between BofA and Ms. Zahran when BofA determined that after six years of a mortgage relationship devoid of any escrow account or charges, and devoid of any material failure by the Plaintiff to perform her duties to stay current on her property insurance and tax payments, nonetheless, the bank could create a new escrow account for her without proper consent, could advance $1,410 on her behalf in the form of a property insurance premium payment to Federated, and could increase the periodic automatically

electronically drafted debited payment amounts from her Truliant checking account by 75%, when

the policy premium for 2019 had already paid in full by the Plaintiff herself back in October 2019.

181.    In trusting Defendant to advise her regarding her personal private financial situation

and information, and confiding to Defendant in a phone call so confidential that Defendant to this

day will not provide even her with a copy, Plaintiff reposed and placed a special confidence in

Defendant who in equity and good conscience was correspondingly bound to act in good faith and

with due regard to the interests of the Plaintiff as the one reposing confidence.[55]

182.    BofA held a fiduciary duty toward the Plaintiff with regard to the escrow account

it purported to establish on her behalf in order to hold funds in trust.[56]

183.    As between the Plaintiff, a single individual, and the Defendant, the second-largest

bank in the United States, and with regard to an escrow account created based on a phone call to

which only Defendant, not Plaintiff, to this day has access, Defendant holds all the cards.[57]

184.    Malfeasance with regard to a mortgage escrow account is a factual basis for a claim

for breach of fiduciary duty.[58]

---

[55] "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013) (citing *Dalton v. Camp,* 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001)). "A fiduciary relationship may arise when there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Id.*

[56] "Generally, in North Carolina . . . there are two types of fiduciary relationships: (1) those that arise from legal relations such as … trustee and *cestui que trust,* [de jure relationships] and (2) those that exist as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other [de facto relationships]." *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC,* 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008).

[57] Only when "one party figuratively holds all the cards – all the financial power or technical information, for example — have North Carolina courts found that the 'special circumstance' of a fiduciary relationship has arisen." *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.,* 219 N.C. App. 615, 621, 730 S.E.2d 763, 767 (2012).

[58] *Compare Lass v. Bank of Am., N.A.,* 695 F.3d 129, 141 (1st Cir. 2012) (breach of fiduciary duty claim arising out of charges for excessive flood insurance and commissions levied by manager of escrow account); *Mahdavieh v. Suntrust Mortg., Inc.,* 2014 U.S. Dist. LEXIS 47775, 2014 WL 1365425 (S.D. Fla. Apr. 7, 2014) ("While a lender generally does not owe a fiduciary duty to its borrower under Florida law, a fiduciary duty may arise in 'special circumstances' . . . [A]n escrow holder generally owes a fiduciary duty to the parties to the escrow transaction"); *Edwards v. Ocwen Loan Servicing, LLC,* 24 F. Supp. 3d 21, 30 (D.D.C. 2014); *Progressive Iron Works Realty Corp. v. E. Milling Co.*, 155 Me. 16, 150 A.2d 760, 762 (Me. 1959) ("There is a fiduciary relationship created by and inherent in the nature of an escrow agreement."); *Hamilton v. Fed. Home Loan Mortg. Corp.*, No. 2:13-cv-00414-JAW, 2015 U.S. Dist. LEXIS 2954, 2015 WL 144562, at *18 (D. Me. Jan. 12, 2015) (a fiduciary relationship could

45

185.     Defendant furthermore held fiduciary duties with regard to the putative class, as to escrow accounts established on behalf of class members, and breached its fiduciary duties based on the facts alleged hereinabove as regards the class members.

186.     Defendant's breach of fiduciary duty was a direct and proximate cause of injury and actual damage to the Plaintiff, and to the class members, for which the Plaintiff and class members are entitled to recovery of compensatory damages.

## COUNT VI
### Declaratory and Injunctive relief

187.     Plaintiff incorporates by reference the above-alleged paragraphs of this Complaint as if restated here in full.

188.     Plaintiff requests that the Court declare the respective rights and duties of the parties to her ongoing agreement with Defendant, and provide appropriate declaratory, equitable and injunctive relief with regard to other similarly-situated borrowers and consumers, including:

   a.   Requiring Defendant to reform its policies regarding providing call recordings to consumers;

   b.   Requiring Defendant to reform its policies regarding confirming a contractual agreement is entered before creating escrow accounts;

   c.   Requiring Defendant to reform its policies regarding providing effective and prompt customer service and avoiding long hold times and dropped calls;

---

arise between a creditor-debtor based on the creation and maintenance of an escrow account); *Crandall v. Bangor Sav. Bank,* No. CV-98-239, 1999 Me. Super. LEXIS 304, 1999 WL 35360329, at *2 (Me. Super. Ct. Nov. 4, 1999); *Poindexter v. Nat'l Mortgage Co*., 1995 WL 242287, at *4 (N.D. Ill. Apr. 24, 1995); *Resolution Trust Corp. v. Holtzman*, 248 Ill. App.3d 105, 112, 187 Ill.Dec. 827, 618 N.E.2d 418, 424 (1993); *Valenza v. Heine*, 1986 WL 15000, at *6 (E.D. Pa.) (lender was trustee over escrow fund and that lender's late payment of real estate taxes was a breach of its duties as fiduciary-escrowee), *aff'd*, 831 F.2d 288 (3rd Cir. 1987); *Choi v. Chase Manhattan Mortg. Co*., 63 F. Supp. 2d 874 (N.D. Ill. 1999) (mortgage escrow account – "Defendants' motions to dismiss … are denied to the extent that those counts represent claims of negligence and breach of fiduciary duty"); *Mark v. Keycorp Mortg*., No. 95 C 4878, 1996 U.S. Dist. LEXIS 11675 (N.D. Ill. Aug. 8, 1996) ("Mark claims KMI breached its fiduciary duty to fairly and truthfully report upon the disposition of his funds, and to demand deposit of only the funds actually required to make escrow payments. KMI argues that there is no fiduciary relationship. However, HN7 New York law regards the escrow relationship as a fiduciary one."); *George A. Fuller Co. v. Alexander & Reed, Esqs*., 760 F. Supp. 381, 386 (S.D.N.Y. 1991); *Davis v. Dime Sav. Bank of New York, FSB*, 158 A.D.2d 50, 52; 557 N.Y.S.2d 775, 776 (1990).

d.   Requiring Defendant to reform its policies regarding confirming that property insurance premiums are due and due in the amount at issue before advancing those costs for the consumer so as to increase a negative balance on an escrow account; and

e.   Requiring Defendant to reform its policies regarding when the Defendant can close an escrow account at a consumer's requests in light of applicable LTV measurements.

189.   Under the circumstances which involve a currently ongoing mortgage and mortgage servicing relationship between the parties and a great disparity of power and resources between them, and her Florida property is a unique[59] and major asset for her, injunctive relief is necessary because Plaintiff lacks an adequate remedy at law specifically to preserve the status quo pending the ultimate resolution of the preceding claims.

190.   Plaintiff requests that the Court grant any injunctive, equitable or declaratory relief as may be appropriate under the circumstances.

## <u>COUNT VII</u>
## (Claim for violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.*)

191.   Plaintiff incorporates her previous allegations 1 through 190 by reference.

192.   Plaintiff's mortgage loan with Defendant with regard to her property in Florida with a street address of 1002 Normandy Trace Rd., Tampa, FL 33602 is a "federally related mortgage loan" under 12 U.S.C. § 2602(1).

193.   Defendant is a "servicer" (i.e., the person responsible for servicing of a loan, including the person who makes or holds a loan if such person also services the loan) within the meaning of 12 U.S.C. § 2605(i)(2).

---

[59] *See* 11A Charles Allan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure Civil § 2944, at 89-90 (2d ed. 1995) (injunctive relief appropriate where "defendant's acts pose a threat to some unique property interest") (citing cases).

47

194. As more specifically alleged hereinbelow, the Plaintiff has sent one or more letters to Defendant which constitute Qualified Written Requests ("QWRs") for which the Defendant had a duty to respond timely and properly under RESPA.

195. Under RESPA, a borrower may submit a QWR through an agent, for example, an attorney. Plaintiff's counsel acted as her agent as to relevant correspondence herein.

196. Prior to filing this lawsuit, Plaintiff through counsel sent a letter dated July 30, 2020 (copy filed at Doc. 14-34) to BANA directed to the offices and addresses identified by BANA as being the proper addresses for RESPA requests.

197. The letter dated July 30, 2020 stated in part as follows:

Our firm represents Ms. Gina Zahran. For ease of reference, please see the enclosed prior correspondence dated July 22, 2020 with enclosures; CFPB complaint by Ms. Zahran dated January 15, 2020; prior email from Ms. Zahran dated July 23, 2020; and prior email by Ms. Zahran dated April 7, 2020. See also your letters dated January 21, 2020, and February 12, 2020 (which are also enclosed for ease of reference).

We ask that you please consider this as a qualified written request under the Real Estate Settlement Procedures Act, 12 U.S.C. 2601 *et seq*., at 12 U.S.C. § 2605(e)(1)(B).

In an email that Bank of America sent to Ms. Zahran on July 23, 2020, Bank of America stated: "Bank of America is unable to provide copies of recorded conversations as this information is proprietary and considered non-public information. Calls are monitored and recorded for quality and training purposes only." And, that "[a]ny requests for call records, notes, documents, etc. must be mailed to the appropriate Notice of Error and Request for Information PO Box, under the Real Estate Settlement Procedures Act (RESPA)."

Your email also stated: "If you are requesting documents and/or certain documentation regarding a mortgage loan account or home equity line of credit, please send the request, in writing, to" the address listed above that we are using for this letter. You add, "Please include the name of the customer, property address, loan number or relevant information needed to identify the account. In addition, please specify the information you are requesting, or details (with supporting documentation) indicating any alleged bank error to be researched." And, "If you are needing a Servicing File, specifically, please indicate as such, in the mailing address (such as below), and also in the body of your written request."

48

Accordingly, we are providing the following information:
1. name of the customer: Gina Zahran.
2. property address: 1002 Normandy Trace Road #1002, Tampa, Florida 33602.
3. loan number: 245570892 (See selected loan documents enclosed for ease of reference).
4. other relevant information needed to identify the account: see enclosed.
5. the information we are requesting, or details (with supporting documentation) indicating any alleged bank error to be researched:
   a. information sought:
      i. The complete Bank of America Servicing File for this loan.
      ii. All call notes and records.
      iii. All call logs, computer notes, customer service entries for this loan and pertaining to the interactions with Ms. Zahran as have been previously summarized in her letter and phone communications and complaints to you and in our prior letter correspondence.
      iv. All call recordings with regard to calls to or from Ms. Zahran on or about November 13, 2019.
      v. More broadly, all call recordings reflecting calls to or from Ms. Zahran from 2013 to now.
      vi. All records pertaining to any mortgage escrow account for Ms. Zahran.

198. Defendant's statement, noted in the letter dated July 30, 2020, that "Bank of America is unable to provide copies of recorded conversations as this information is proprietary and considered non-public information," is false and pretextual. The recordings cannot be proprietary, i.e., trade secrets, as they were calls with Ms. Zahran, an outsider, who furthermore had the right unilaterally to record the call if she had wanted. They are not non-public, as a basis not to disclose them to her, as they were calls with her.

199. The statement that "[c]alls are monitored and recorded for quality and training purposes only" is also false and pretextual. As is evident from BANA's letters and conduct herein, it did not simply use the recordings of its calls with Plaintiff for "quality and training" purposes – it also used them as a basis to claim it could open a mortgage escrow account, and debit mortgage

escrow charges from her Truliant bank account. That was not using the call for "quality" or for "training," but rather, using it as an oral contract.

200. The letter sent by Plaintiff on July 30, 2020 was both a QWR, and a Request for Information, as defined by Regulation X, 12 C.F.R. § 1024.36(a), in that it requested information that sufficiently identified the subject mortgage and properly specified information relating to it.

201. Regulation X, 12 C.F.R. § 1024.36(a) states that when a proper written request for information from a borrower is sent in, and states the information the borrower is requesting with respect to the borrower's mortgage loan, or relating to the servicing of the mortgage loan, then "a servicer **must** comply with all requirements applicable to a request for information with respect to such qualified written request." (Emphasis added).

202. Under 12 C.F.R. § 1024.36(c), "[w]ithin five days (excluding legal public holidays, Saturdays, and Sundays) of a servicer receiving an information request from a borrower, the servicer shall provide to the borrower a written response acknowledging receipt of the information request." Within five days of its receipt of the letter dated July 30, 2020 (Doc. 14-34), Defendant failed to provide an acknowledgment of receipt as required by 12 C.F.R. § 1024.36(c).

203. Under 12 C.F.R. § 1024.36(d)(1), absent the applicability of certain exceptions which do not apply, "a servicer must respond to an information request by either: (i) Providing the borrower with the requested information …; or (ii) Conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination…."

204. Here, BANA did not provide Plaintiff with the requested information. Nor did it provide a written notification that the information was not available. Nor did it conduct a reasonable search for information.

205.     Under 12 C.F.R. § 1024.36(d)(2)(i)(B), in general a servicer must comply with the requirements of § 1024.36(d)(1) "not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the information request." Defendant failed to respond as required by the regulation within 30 days after it received the July 30, 2020 letter. No exception to the response duty applies.

206.     Upon receipt of the Request for Information in the form of the letter of July 30, 2020, BANA was obligated either to provide the requested information or conduct a "reasonable search" and notify the borrower that the requested information was not available, and do so in a timely manner. 12 C.F.R. § 1024.36(d). Defendant failed to provide information specified in the Request for Information dated July 30, 2020 that was available, including, but not limited to:

   a.     The servicing file for her loan.
   b.     The call notes and records.
   c.     The call logs, computer notes, customer service entries for her loan and pertaining to the interactions with Ms. Zahran as had been previously summarized in her letter and phone communications and complaints to BANA and in her law firm's prior letter correspondence.
   d.     The relevant call recordings starting with all calls with Ms. Zahran on November 13, 2019, but also including others within the key times.

207.     With regard to her Request for Information dated July 30, 2020, Defendant failed to conduct the "reasonable search" for available information mandated by 12 C.F.R. § 1024.36(d)(1)(ii); and failed to provide a timely written response per 12 C.F.R. § 1024.36(d)(1)(ii).

208.     Defendant's failure to comply with its obligations with regard to Plaintiff's Request for Information dated July 30, 2020 reflects a pattern or practice of failing to properly respond to such inquiries, as evidenced by:

   a.     BANA refused to provide the information sought in response to letters, emails or written communications sent to BANA by Ms. Zahran or her counsel or forwarded to BANA by the CFPB, dating prior to July 30, 2020.

b. BANA refused to provide the information sought in response to letters, emails or written communications sent to BANA by Ms. Zahran or her counsel or forwarded to BANA by the CFPB, dating after July 30, 2020.

c. BANA did not produce Ms. Zahran's basic servicing file – despite holding out that it has a special office address where requests for servicing files can be sent, and despite Plaintiff sending one or more letters to that address.

d. BANA failed to provide either the servicing file or the call audio files even after Plaintiff filed her detailed lawsuit in that regard.

e. BANA has known since January 2020 that Ms. Zahran contested what BANA characterized as the import of phone calls between her and BANA representatives. Yet, it has failed to produce all the call recordings, has refused to describe in writing what call recordings or audio files it has or does not have; she has sent pertinent information from her phone bills with calls to BANA numbers highlighted, to BANA, with no luck; her lawyer has written letters to BANA citing case law reflecting that courts have found it proper to have phone recordings produced; BANA representatives have indicated to her during calls that they have computer entries or log entries for her file, but BANA has failed to even produce any of those.

f. There is evidence starting with records from other court cases of BANA engaging in similar practices as to other borrowers.

209. On August 7, 2020, Plaintiff through her attorney agent wrote to BANA at its office address it held-out as the proper address for RESPA correspondence, i.e., Bank of America, Notice of Error/Request for Information, PO Box 942019, Simi Valley, CA 93094-2019. (Doc. 14-37).

210. The August 7, 2020 letter recited the prior correspondence including the letter from Ms. Zahran's attorney to BANA representatives Ms. Juarez and Mr. Maclennon-Cade dated July 22, 2020 (Doc. 14-32); her CFPB complaint dated January 15, 2020, which was forwarded to BANA (see Docs. 14-12; 14-13); an email dated July 23, 2020 (Doc. 14-33); an email dated April 7, 2020 (Docs. 14-25 & 14-26); and the July 30, 2020 letter (Doc. 14-34).

211. The Plaintiff's August 7, 2020 letter described that Plaintiff had reviewed the July 31, 2020 letter BANA had sent. (Doc. 14-35). In it, BANA stated that it had "call transcripts." Those have not been provided. They fall within the scope of Plaintiff's requests for information. Defendant has breached its RESPA disclosure duties by not providing them. Further, "call

52

transcripts" implies that BANA also has call recordings or audio files. Yet, they were not timely produced. They have been within the scope of Plaintiff's requests for information. Defendant has breached its RESPA disclosure duties by not providing them.

212.    In the July 31, 2020 letter, BANA stated that it will not produce call transcripts because it does not create them in its ordinary course of business. This is false and pretextual and not a recognized basis to refuse to provide borrower file information under Regulation X as construed by the CFPB. BANA also stated that its call recordings are considered proprietary information. This is a baseless reason to withhold call recordings for reasons including:.

   a.    Plaintiff as a consumer, not a competitor. She was a borrower, had a mortgagor-mortgagee relationship with BANA dating back to 2013, had trusted BANA in its role as servicer, had paid BANA over $67,000 over the course of the mortgage to date, and had given BANA personal private information. It was her voice on her calls with BANA employees and customer service representatives. BANA cannot claim whatever was said on those calls was confidential from disclosure to her, as call participant. Nor could BANA claim the call content was somehow proprietary -- she was on the calls, and they do not meet the definition of proprietary trade secret information.

   b.    Further, even while withholding the call audio files or transcripts from Plaintiff, BANA was simultaneously purporting to describe how it had listened back to the calls, and was using them as a basis for unwanted charges.

213.    In part because Defendant had by August 3, 2020 failed to provide call or servicing file information for Ms. Zahran, on August 3, 2020 she filed her lawsuit in this matter. Doc. 1.

214.    On August 25, 2020, BANA (via its counsel) finally provided audio files for certain phone calls occurring on November 13, 2019. But, they are incomplete and recordings for the other calls she had that day with BANA phone numbers were not included. Her phone bills itemize three calls with BANA numbers on that date, and, she has stated that she recalls calling BANA more than once on that date to emphasize she only wanted information on an escrow account, not to have one opened. Also, her loan servicing file was not produced.

215. Further, by August 25, 2020, BANA had already breached its duties under RESPA. As early as January 15, 2020, BANA knew that Ms. Zahran was claiming there were multiple calls that were relevant. For example, see her CFPB complaint from January 15, 2020. (Doc. 14-12).

216. On August 25, 2020, BANA produced a recording of a call on November 13, 2019 between Ms. Zahran and a representative named William, who later transferred her to another representative, Daisjah. On information and belief, BANA has produced only this recording despite being asked for others, as it believes this one recording supports its position. However, Plaintiff contends there were subsequent calls which are relevamt. And, a review of the call recording produced, as transcribed, reflects BANA through its representatives providing false and misleading information to the Plaintiff.

217. In the November 13, 2019 call, Ms. Zahran is recorded as asking, "I want to know if I can escrow in my taxes and insurance without having to refinance?" (Tr. 11/13/19 call 1, at 2:16-17). William says, "we just need to get one of my escrow analysts on the line and we can get you all enrolled in. (*Id*., 2:22-24). She asks, "And there's no fee at all for that?" Answer: "No. No, there's no fee for setting it up." She responds, "Okay. Yeah, I'd like to do that." (*Id.* at 2:25-3:4). (See Nov. 13, 2019 call transcript prepared by Plaintiff using a court reporter, of the recording provided on Aug. 25, 2020).

218. This was misleading information in that actually, BANA does not just require the consumer to pay in enough to cover property taxes and insurance, when it sets up an escrow. BANA <u>also</u> charges the consumer a "cushion," *see* 12 C.F.R. § 1024.17(b), i.e. an extra amount which by regulation can be as much as one-sixth of the estimated total annual payments from the account. 12 C.F.R. § 1024.17(c)(1)(i). BANA charges that maximum amount or close to it.

219. The parties' 2013 mortgage agreement states that if the parties agreed to an escrow agreement, then BANA could collect funds in an amount sufficient to permit it to apply the funds,

"not to exceed the maximum amount a lender can require under RESPA." (Doc. 14-3, page 4 of 12). However, the 2013 mortgage agreement is silent as to whether the borrower and lender agree for the cushion to be at the maximum amount, or something less than that, leaving that for future agreement. In the Nov. 13, 2019 phone call, there is no reference to the escrow cushion nor any agreement as to whether BANA could charge the maximum for the cushion. On information and belief, when in November or December 2019 Defendant decided to open the escrow account, it began charging Plaintiff based on its unilateral selection of a cushion amount set to the maximum allowed under RESPA.

220. In the call recording BANA produced, William transferred Ms. Zahran to speak with Daisjah. (Tr. 11/13/19 call 1, at 3:9-11; the continued call with Daisjah picks up in the transcript titled as Tr. 11/13/19 call 2, but it is all part of the same call). Ms. Zahran asks her as she asked William, "[a]nd there's no charge for that, right?" (Tr. 11/13/19 call 2 at 2:5-13). Daisjah responds, "the only charge it will be is the amount that we have to pay out. So your payment would increase based off whatever premium there is for your taxes and insurance." (*Id*. at 2:10-13). She adds, "So the escrow is not like a fee to set up. It would just be a – your monthly payment will just increase a little due to the escrow being established." (*Id*. at 2:18-21).

221. Daisjah's statements were misleading because the charge is not just what BANA has to pay out; it is also the cushion on top. And, Ms. Zahran's payment did not just increase "a little": the escrow account increased her mortgage payment from $426 to $747 – a 75% increase.

222. Daisjah told Ms. Zahran to upload her property insurance information onto an internet portal. The "back office" would review it and "[i]n about three to five days" "we will send you basically what we call a escrow analysis statement. And before we do anything for you, we'll just want you to verify that everything is good with that new payment and all." (*Id*. at 4:19-5:1). On information and belief, this was misleading and not in accordance with what occurred.

223. Based on her discussions with BANA representatives in this and other calls, Ms. Zahran expected that BANA would send her an agreement to sign and return (or sign electronically via E-sign), before charging the escrow, but that never happened.

224. Instead on December 13, 2019, BANA made a "hazard insurance payment" of $1,410. (Doc. 14-22, page 12 of 16). This was listed as a debt, a negative balance, on her "escrow balance," which from 2013 until then had always been only $0. (Doc. 14-22, pp. 4-12).

225. As of December 13, 2019, Plaintiff had already paid her property insurance premiums for 2019, as BANA knew. (Tr. 11/13/19 call 2 at 5:22 ("I'm all up to date.")). BANA knew the next payment was not due yet until 2020. (*Id.* at 5:25 (Daisjah: "So this will be 2020."); 6:13-14 (Gina Zahran: "it doesn't expire until January of 2020."); 7:7-9 (Gina: "because I pay it quarterly. So I just paid October. So yeah, I wouldn't pay again until January of 2020.")). BANA knew she paid quarterly, and the next payment was not due until January 2020. BANA improperly paid the property insurance in an amount of $1,410, in December 2019, when it was not due. Plaintiff has asked Defendant to explain and correct the error in RESPA letters which have gone without substantive response on this point.

226. Ms. Zahran also asked whether she could calculate her escrow charge by taking her tax and insurance costs for the year and divide that by her number of mortgage payments. Daisjah responded, "you're right with the calculation" and that "you would just do the tax amount that you just paid by 12, and then, you would do the homeowners policy by 12. And then, that would give you the … sum of what the escrow would be, yes, ma'am. So your calculations are right." (Tr. 11/13/19 call 2 at 10:24-11:10).

227. That was misleading. In fact, BANA would also charge the cushion amount, which would make her payment greater. BANA would use this cushion amount as a "float," i.e., an interest-free loan from her to it to use and keep any interest or earnings. At the end of the mortgage,

when the escrow account would be closed, presumably BANA would refund any leftover amounts still in her account; but not any interest or earnings off the "float."  This amount, aggregated over thousands of borrowers, runs to the millions of dollars.

228.  The call on November 13, 2019 ended with Daisjah saying "[w]e'll be getting -- reaching out to you very shortly." (Tr. 11/13/19 call 2 at 12:22-23). Because Defendant has still failed to provide all the call recordings or information from this time period, Plaintiff only knows that later calls occurred, including two more on November 13 itself, and forward – but not what their recorded contents show.

229.   BANA claims it sent Plaintiff an escrow estimate on December 2, 2019, however, she does not recall it, and the first copy of one she could find in her file papers prior to filing suit was a copy later sent to her.  That document is further inaccurate for the following reasons:

    a.    It states that if she elects, she can make a payment of $2,224.67 by January 18, 2020, to avoid having the escrow amount spread over 12 monthly payments.  (Doc. 14-35, p. 3 of 7).  But her payment history then shows the first higher payment of $747 that includes the escrow being electronically withdrawn from her Truliant account on January 10, 2020.  (Doc. 14-22, p. 13 (payment history); Doc. 14-23 (BANA letter stating they withdrew $747 on January 10, 2020)). Thus, BANA improperly started taking out payments before the Jan. 18, 2020 election date had arrived.

    b.    The document bases its payment amount in part on an estimate that BANA will pay $1,318 for her 2021 homeowner's insurance premium in January 2021.  (Doc. 14-35, p. 5 of 7). That would have been the insurance premium for 2021. Yet BANA then paid $1,410 toward the insurance, on December 13, 2020. (Doc. 14-23 (BANA letter: "Our records indicate on December 13, 2019, Bank of America paid your insurance payment in the amount of $1,410.00, which was due on January 16, 2020.")).  It cannot be the case that BANA was going to pay $1,410 for the 2021 insurance premium in December 2020 and then pay $1,318 for the same premium in January 2021.

    c.    Also, the Dec. 2, 2019 statement failed to reflect that BANA would make the $1,410 insurance payment, which it would then show as a debt she owed, on December 13, 2019.  Doc. 14-35.  There was no disclosure that BANA would advance $1,410 on Dec. 13, 2019.  Even if she had gotten the Dec. 2, 2019 statement, it would not have warned her.

d.      The document represents that the extra "cushion" amounts were "required." Doc. 14-35, p. 5 of 7 ("The required minimum balance (which is also sometimes called a cushion)"). In truth, it was not required. The 2013 mortgage did not require it. BANA just decided to charge it.

230.    Ms. Zahran recalls that in subsequent calls, she told BANA she did not want an escrow account. She has claimed that consistently; see CFPB complaint, January 15, 2020. (Doc. 14-12). In that complaint she sent to the agency, she said "I called back and told them I would NOT be escrowing my taxes & insurance." As to the details of when she called back and what she said, Plaintiff is hindered because BANA has refused to provide all the call recordings.

231.    12 C.F.R. § 1024.36(d), per the 2014 amendments, imposes stringent duties on the part of servicers, as BANA is aware by being a party in one of the first cases adjudicated after the amendments, *Wilson v. Bank of America, N.A.*, 48 F. Supp. 3d 787, 804 (E.D. Pa. 2014). 12 C.F.R. § 1024.36(d) as noted states that the Defendant "must" respond to the information request by either providing the borrower with the requested information, or conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available, within 30 days.

232.    The official CFPB interpretation of Regulation X clearly reflects that the servicer must provide copies of telephonic communications where appropriate, giving as an example of "when information is available (or not available) to a servicer under § 1024.36(d)(1)(ii)":

A borrower requests a copy of a telephonic communication with a servicer. The servicer's personnel have access in the ordinary course of business to audio recording files with organized recordings or transcripts of borrower telephone calls and can identify the communication referred to by the borrower through reasonable business efforts. The information requested by the borrower is available to the servicer.

233.    The August 7, 2020 request for information from Plaintiff, which was a qualified written request under RESPA, requested copies of all relevant call recordings, provided call details and phone numbers from her phone bills. It is now more than two months after the date of the

58

August 7 letter and Defendant has yet to produce all recordings or confirm in writing the details of its reasonable search and the reasons why information is not available.

234.    The August 7, 2020 request for information from Plaintiff also asked BANA to confirm whether her insurance information was loaded to the portal on 11/13 or some other date. Defendant has failed to respond substantively to that request as required under Regulation X.

235.    The August 7, 2020 letter also requests that BANA correct an error.   Doc. 14-37, p. 3.  Plaintiff claimed that BANA had imposed a fee or charge that the servicer lacked a reasonable basis to impose upon the borrower, see 12 C.F.R. § 1024.35(b)(5), and otherwise made errors in its servicing of the loan.   12 C.F.R. § 1024.35(b)(11).  BANA had a duty to address and correct the error.  Under 12 C.F.R. § 1024.35(b)(5), an error may include the "[i]mposition of a fee or charge that the servicer lacks a reasonable basis to impose upon the borrower."  Under 12 C.F.R. § 1024.35(b)(11), an error may include "[a]ny other error relating to the servicing of a borrower's mortgage loan."

236.    Under 12 C.F.R. § 1024.35(d)(11), once the servicer receives an error request, "[w]ithin five days (excluding legal public holidays, Saturdays, and Sundays) of a servicer receiving a notice of error from a borrower, the servicer shall provide to the borrower a written response acknowledging receipt of the notice of error."  Defendant violated this requirement.

237.    Under 12 C.F.R. § 1024.35(e)(1)(i), once the servicer receives an error notice, generally the servicer must respond by either: "(A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to

request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance." Defendant failed to abide by these requirements.

238. Under 12 C.F.R. § 1024.35(e)(3)(i)(B) & (C), once the servicer receives an error request, it must provide the substantive responsive information within 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the notice of error. Defendant failed to abide by this requirement.

239. Under 12 C.F.R. § 1024.35(e)(4), once the servicer receives an error notice, "[a] servicer shall provide to the borrower, at no charge, copies of documents and information relied upon by the servicer in making its determination that no error occurred within 15 days (excluding legal public holidays, Saturdays, and Sundays) of receiving the borrower's request for such documents. A servicer is not required to provide documents relied upon that constitute confidential, proprietary or privileged information. If a servicer withholds documents relied upon because it has determined that such documents constitute confidential, proprietary or privileged information, the servicer must notify the borrower of its determination in writing within 15 days (excluding legal public holidays, Saturdays, and Sundays) of receipt of the borrower's request for such documents." Here, Defendant failed to abide by this requirement, and, any determination by it that the requested records constituted confidential, proprietary or privileged information was without a reasonable basis.

240. Under 12 C.F.R. § 1024.35(f)(1), once the servicer receives an error request, "[a] servicer is not required to comply with paragraphs (d) and (e) of this section if the servicer corrects the error or errors asserted by the borrower and notifies the borrower of that correction in writing within five days (excluding legal public holidays, Saturdays, and Sundays) of receiving the notice of error." Here, the servicer did not correct the errors and did not properly notify the Plaintiff.

60

241. The exceptions to the compliance requirements stated under 12 C.F.R. § 1024.35(g) did not apply herein. The correspondence sent by the Plaintiff was not duplicative, or, it added new requests, contentions, or bases for requests or contentions not stated before. *See* 12 C.F.R. § 1024.35(g)(1)(i) (not duplicative notice of error where "the borrower provides new and material information to support the asserted error"). Nor were the requests overbroad; they were not such that "the servicer cannot reasonably determine from the notice of error the specific error that the borrower asserts has occurred on a borrower's account." 12 C.F.R. § 1024.35(g)(1)(ii). Further, defendant had to notify plaintiff if it was refusing to engage on any of those bases. 12 C.F.R. § 1024.35(g)(2).

242. Plaintiff's written inquiries were proper under RESPA, asked for information related to the servicing of her account, and notified of errors. The Defendant's non-compliance in responding to her qualified written requests covered by 12 U.S.C. § 2605(e) included: misrepresenting that call recordings were proprietary, confidential, or privileged; failing to acknowledge letters; failure to provide reasonable responsive information; failure to explain the charge of $1,400 for property insurance; failure to explain why account could not be closed due to loan-to-value requirement; and otherwise as reflected by the correspondence.

243. Upon information and belief, Defendant's noncompliant investigation and written response to Plaintiff's qualified written requests reflects an ongoing and deliberate pattern and practice of noncompliance, in that it has occurred notwithstanding the 2014 amendments to Regulation X, then CFPB guidance, and court opinions.

244. On September 23, 2020, Plaintiff sent another qualified written request letter under RESPA. (Doc. 14-39). The September 23, 2020 letter expressly requested the basic "servicing file" documents listed under 12 C.F.R. § 1024.38(c)(2), including among others, "a schedule of all transactions credited or debited to the mortgage loan account, including any escrow account and

any suspense account;" "any notes created by servicer personnel reflecting communications with the borrower about the mortgage loan account;" and "a report of the data fields relating to the borrower's mortgage loan account, to the extent applicable, created by the servicer's electronic servicing systems." None of those documents have been provided, beyond a partial payment history through February 2020. (Doc. 14-22).

245. The September 23, 2020 letter requested, again, that BANA provide information regarding Plaintiff's mortgage servicing and associated escrow account. The letter recited new information derived from transcripts of the calls recorded by Ms. Zahran herself (once she realized BANA would not share what it had), reflected that BANA had an apparent stated policy of not producing call recordings, including of the calls purportedly giving BofA its contractual basis to impose the escrow charges.

246. The September 23, 2020 letter reiterated that "we would like BofA to simply produce all call recordings for all calls to or from Gina from November 1, 2019 onward through September 1, 2020, based on the fact that her first known substantive engagement by phone with BofA customer service representatives on the mortgage escrow issue fell on November 13, 2019 and then there are a fair number of alleged and documented call interactions going forward. She discovered the escrow account she alleges to be improper, in January 2020. But the calls and the problems persisted after that." Doc. 14-39, p. 3.

247. The September 23, 2020 letter provided more information regarding the event when BANA had her upload insurance information onto an internet portal, Doc. 14-39, pp. 3-4, and notd that presumably BANA tracks and documents such transactions.

248. The September 23, 2020 letter provided more information to make it easier for Defendant to locate the call audio and related information. We inquired as to why the recording BANA belatedly produced on August 25, 2020 for only one call was shorter in duration than what

her phone bill showed the call length to be.  We cut and pasted excerpts from her phone bills to show the three BANA-number calls on the November 13 date for which we sought information:

| Nov 13 | 2:09 PM | 800.669.6607 | Charlotte, NC | Toll-Free, CL | 15 |
| Nov 13 | 4:05 PM | 800.732.9194 | Charlotte, NC | Toll-Free, CL | 2 |
| Nov 13 | 4:11 PM | 877.754.6707 | Charlotte, NC | Toll-Free, CL | 22 |

(Doc. 14-39, letter p. 6).

249.    The September 23, 2020 letter also identified calls to BANA phone numbers on November 21, 22, 25, and 26, 2019.  Plaintiff raised the same questions as to those.  We requested the recordings for these calls given their significance.  From her redacted cellphone bill, we even provided BANA with that data too:

| Date | Time | Number | Origination | Destination | Min. |
|---|---|---|---|---|---|
| Nov 21 | 2:55 PM | 800.732.9194 | Charlotte, NC | Toll-Free, CL | 14 |
| Nov 22 | 10:06 AM | 866.701.3822 | Charlotte, NC | Toll-Free, CL | 14 |
| Nov 25 | 2:30 PM | 866.701.3822 | Charlotte, NC | Toll-Free, CL | 5 |
| Nov 26 | 10:21 AM | 866.701.3822 | Charlotte, NC | Incoming, CL | 13 |
| Nov 26 | 11:31 AM | 888.248.2401 | Charlotte, NC | Toll-Free, CL | 20 |
| Nov 26 | 11:51 AM | 980.335.3561 | Charlotte, NC | Charlotte, NC | 29 |

250.    The September 23, 2020 letter also provided further information regarding the December 2, 2019 notice and requested that BANA produce information to clarify the issue of whether the statement was actually put in the mail on that date.  Doc. 14-39, p. 7.  The September 23, 2020 letter also noted additional calls to BANA numbers, reflected by her phone bills, during the material period of time through December 2019, and asked that the call recordings and associated servicing file materials be provided.

251. The September 23, 2020 letter also provided further information regarding BANA's property insurance payments and made inquiries. Plaintiff asked, if BANA paid $1,410 to cover 2020 (as a full pre-payment for the entire year), then why did BANA later pay $840 on April 14, 2020 also to cover 2020 (as a part-payment on the same insurance for the same period)? BANA has not substantively responded.

252. The September 23, 2020 letter also noted that when Plaintiff sought to undo the escrow, she was told by BANA employees that she just had to get BANA refunded from her insurance carrier for the $1,410 amount, which Ms. Zahran then did. However, BANA still did not remove the escrow account, claiming a loan-to-value metric prevented it. We raised these issues – they have not been addressed or responded to by BANA within the RESPA deadlines.

253. The September 23, 2020 letter also noted that December 13, 2019 was the date when apparently a call note was placed in the servicing file describing that Plaintiff said she did not want the escrow account. However, the servicing file has not been provided.

254. During a three-hour call with Ms. Zahran on July 22, 2020, which she recorded, a BANA representative named Rob stated that there was a call note in the system to the effect that another agent named Sarai noted, "customer said she didn't want escrow" on a call from December 13, 2019. Plaintiff asked that BANA produce this file. It has not done so. (Doc. 14-39, p. 8). Indeed, Plaintiff's Verizon records show a call did indeed occur on that date:

| Dec 13 | 4:51 PM | 800.669.6607 | Charlotte, NC | Toll-Free, CL | 6 |

255. In the September 23, 2020 letter we stated: "We need this call recording obviously." Doc. 14-39, p. 9. Defendant's failure to provide all of these call recordings and related requested information is a violation of its duties under RESPA.

256. In the September 23, 2020 letter, Plaintiff expressly raised the loan-to-value issue as well, requested information, and alleged it as an error. Specifically, on February 25, 2020,

BANA wrote Ms. Zahran stating that it could not delete the escrow account, because her loan to value proportion (LTV) was too high: "The loan-to-value (LTV) ratio on your mortgage must be 80% or less. We calculate this by dividing the current principal balance by the sale or appraisal value, whichever is less. The LTV on your loan is currently 87.001%." (Doc. 14-39, p. 10).

257. As a result of Defendant's failure to comply with its above-described obligations, Plaintiff suffered actual damages cognizable under RESPA; and is in addition or in the alternative entitled to statutory damages based on evidence and proof of Defendant's pattern or practice of noncompliance, plus attorney fees and costs, pursuant to 11 U.S.C. § 2605(f).

258. Defendant's pattern and practice of noncompliance is evidenced by the set of facts alleged hereinabove as to its interactions with Ms. Zahran. It is further evidenced by public information reflecting occurrence of similar acts and practices with regard to other similarly situated consumers.

259. Under the circumstances and timeline of events alleged above, Ms. Zahran has suffered actual injury and to incurred compensable actual damages. If BANA had timely and reasonably reviewed and responded to the qualified written requests, provided the requested materials and corrected the noted errors, that would have resulted in the escrow account being closed and remedied earlier saving Ms. Zahran time, effort and expense.

260. In addition, Ms. Zahran has suffered aggravation, annoyance, inconvenience, anxiety, mental and emotional distress and discomfort due to Defendant's failures to timely and reasonably perform its RESPA duties.

261. In addition, Ms. Zahran has incurred out-of-pocket costs and attorney time and expense which would not have been incurred but for the Defendant's RESPA violations.

262. In addition, Plaintiffs respectfully shows that the claim may properly be certified for a class of similarly-situated individuals. Specifically, Defendant's practices with regard to its

receipt, processing of, and response qualified written requests under RESPA is on information and belief highly automated and based on standard policies and procedures. Plainly, based on Ms. Zahran as an example, when a borrower sends a qualified written request for her servicing file to the Defendant's listed office address for precisely such requests, this does not in fact lead to production of those servicing files. Accordingly, Plaintiff is entitled to an award of damages for the class in an amount as allowed under 12 U.S.C. § 2605(f) which shall not exceed the lesser of $1,000,000 or one percent of the net worth of the servicer.

### Jury Demand

Plaintiff respectfully demands trial by jury of all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this case be certified and maintained as a class action and for judgment to be entered against Defendant as follows:

a. designating Plaintiff as the class representative, and designating the undersigned as class counsel;

b. certifying the proposed class,

c. declaring that Defendant under the circumstances should properly be financially responsible for notifying all class members of class notice;

d. finding that Defendant violated the EFTA, 15 U.S.C. § 1693e(a) and 12 C.F.R. § 205.10(b);

e. finding that Defendant is liable for unfair and deceptive trade practices under North Carolina law;

f. finding that Defendant is liable for breach of contract;

g. finding that Defendant is liable for unjust enrichment;

h. finding that Defendant is liable for breach of fiduciary duty;

i. awarding actual, statutory and/or compensatory damages to Plaintiff and all members of the class;

j.   awarding appropriate declaratory, equitable and injunctive relief;

k.   awarding reasonable costs and attorneys' fees;

l.   awarding any pre-judgment or post-judgment interest to which Plaintiff and the class may be entitled; and

m.  granting such other relief as this Honorable Court deems appropriate.

This the 8th day of January, 2021.

s/John Hughes
Mona Lisa Wallace, NC State Bar # 009201
John Hughes, NC State Bar # 22126
Daniel Wallace, NC State Bar # 46480
Wallace & Graham, PA
525 N. Main Street
Salisbury, North Carolina 28144
Telephone: (704) 633-5244
Facsimile: (704) 633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com
dwallace@wallacegraham.com

Janet R. Varnell
VARNELL & WARWICK, P.A.
1101 E. Cumberland Ave.
Suite 201AH #105
Tampa, FL 33602
(352) 753-8600
Email: JVarnell@VarnellandWarwick.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2021, a copy of the foregoing was filed electronically with the Clerk of Court via the Court's CM/ECF system. This will ensure electronic service on all counsel of record.

*s/ John Hughes*
John S. Hughes
NCSB 22126
WALLACE & GRAHAM, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Telephone: (800) 849-5291
Email: jhughes@wallacegraham.com

*Co-counsel for Plaintiff*
